IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ROCHELLE HOFFMAN,

        Plaintiff,

      v.                         Case No. 23-CV-853

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM
ET AL,

        Defendants.

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Rochelle Hoffman worked for the University of Wisconsin – Eau Claire (UWEC). Hoffman alleges violations of Title VII for intentional discrimination and hostile work claims based on her race (white), and retaliation against her after she filed an internal complaint about the allegedly discriminatory and harassing conduct aimed at her. She brings individual claims under § 1983 against UWEC's Chancellor, James Schmidt, and Affirmative Action Officer, Teresa O'Halloran.

All of Hoffman's claims fail for the reasons set forth below. Defendants request that the Court grant their motion for summary judgment and dismiss all claims.

## SUMMARY STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### The parties and other relevant individuals

---

[1] Defendants incorporate their Proposed Findings of Fact (DPFOF) filed herewith. Additional facts contained in the DPFOF are discussed in the Argument section of this brief.

Hoffman is a former employee of UWEC. (DPFOF ¶ 1.)

Defendant, the Board of Regents of the University of Wisconsin System (the "Board") is responsible for establishing policies and rules for governing the University of Wisconsin System and, among other things, establishing the regulatory framework within which the individual universities are allowed to operate with as great a degree of autonomy as possible. (DPFOF ¶ 2.) The University of Wisconsin—Eau Claire (UWEC) is part of the Universities of Wisconsin System (UW System), which is governed by the Board of Regents of the UW System. The UW System was comprised of 13 four-year schools, including UWEC, at the times relevant to this case. (DPFOF ¶ 3.) UWEC serves 9,400 students, with 200+ academic programs. (DPFOF ¶ 4.)

James Schmidt is the Chancellor of UWEC. He has served in that role since July 1, 2013. (DPFOF ¶ 5.) As Chancellor, he serves as the chief executive officer of the university with overall responsibility for strategic leadership and finance decisions for the campus. (DPFOF ¶ 6.) Teresa O'Halloran is currently the interim Assistant Chancellor for Equity, Diversity and Inclusion, effective as of November 21, 2022. (DPFOF ¶ 7.) In 2022, O'Halloran was employed by UWEC in the Affirmative Action Office as the Executive Director of Equity Compliance and Title IX and has been in this role since approximately 2006. (DPFOF ¶ 8.)

Jennifer Steinhorst[2] was a Human Resources Representative at UWEC from August 2016 until she was promoted to HR manager in October 2022 and Chief Human Resources Office in September 2024. As an HR Representative, Steinhorst

---

[2] Steinhorst recently had a name change. Her current last name is Wilczek but this brief will refer to her prior name Steinhorst as that was the name she used during the time relevant to this lawsuit.

assisted with recruiting, reorganizations, salary conversations, and employee relations for all departments under Finance and Administration, Equity, Diversity and Inclusion, Student Affairs, and Foundation/Alumni. (DPFOF ¶ 9.)

Olga Diaz is a former Vice-Chancellor of Equity, Diversity, Inclusion and Student Affairs (EDISA) at UWEC. She was employed by UWEC from approximately June 2021 through late September 2022. Diaz is represented by the same law firm that represents Plaintiff in this case. (DPFOF ¶ 10.) Diaz was Hoffman's supervisor for most of the time relevant to this case. (DPFOF ¶¶ 61, 80, 94-95.)

The Board and UWEC have anti-discrimination policies in place. (DPFOF ¶¶ 171-72.) The Board issued Regent Policy Document 14-6 titled Discrimination, Harassment, and Retaliation. The policy applies to all areas of the UW System programs, activities, employment practices and operations. (DPFOF ¶ 171.) UWEC prohibits racial discrimination and harassment and maintains policies to that effect. (DPFOF ¶ 172.) UWEC provides multiple ways for employees to report concerns, including via internal management or filing an internal complaint. The information on the anti-discrimination and anti-harassment policies and the ways concerns can be reported are provided to faculty, staff and students in various ways, including by posting it on UWEC's website. (DPFOF ¶ 173.)

**Merger of Blugold Beginnings and Office of Multicultural Affairs**

There were two units within EDISA that are at the center of Hoffman's litigation. One is called Blugold Beginnings (BB) and the other, the Office of Multicultural Affairs (OMA). (DPFOF ¶ 44.) In 2021 and early 2022, Diaz began to

3

plan for the possible merger of BB and OMA. (Eventually, later in spring semester 2022, the new unit would receive a name – Multicultural Student Services (MSS).) The original intended timeline for the proposed merger of BB and OMA was that work would be done to prepare for the merger during the spring semester of 2022, have it effective by the new fiscal year, July 1, 2022, and have a rollout of the merged unit for fall semester 2022. (DPFOF ¶ 44.) In January 2022, the former directors of BB and OMA resigned, and Diaz believed she needed to identify who would lead both BB and OMA and eventually the combined departments. (DPFOF ¶ 47.) The merge plan was accelerated following the resignations because OMA staff reported they could not serve their students. (DPFOF ¶ 48.)

In February 2022, word of the planned merger of BB and OMA hit campus. The merger was far from universally well received on campus. (DPFOF ¶¶ 88-91, 100, 106, 116.) There was opposition to the merger itself, including concerns that the merger would hurt the students served. (DPFOF ¶ 106, Ex. 206 at pp. 16-21.) But also, the way the plans for BB and OMA were unveiled to campus created the perception it was being rushed and moved forward without involving campus shared governance and, particularly the students of BB and OMA, in the decision-making process. It was part of a restructuring of EDISA that also generated concerns. It was part of a larger conversation related to years of discussion about the recruitment, retention and promotion of diverse staff and faculty, and how multicultural students were served on campus. Much of the conduct and statements that Hoffman contends are the source of her hostile work environment claim relate to and arise out of this

campus discussion about representation, leadership and whether the voices of faculty, staff and students of color were heard. These were long-standing criticisms of the UWEC administration, including the Chancellor. Media reported on the planned merger, the open houses and the faculty and student responses. (DPFOF ¶¶ 88-90, 97, 102-103, 106, 110, 134, 255, 265, 273-274.)  By February 24, 2022, Diaz decided she needed to return to the original timeline for planning for the merger. (DPFOF ¶¶ 54-56.)

**Hoffman's assertions about her employment at UWEC during 2021 and 2022**

Hoffman never wanted to be the Director of the unit that would come into existence following the merger of BB and OMA. She did not apply for the position during the open search process. (DPFOF ¶ 62.)

Hoffman contends that in "late January 2022 Vice Chancellor Diaz appointed her to the position of Interim Director of MSS. Diaz anticipated that Hoffman would fill the role of Interim Director of MSS at least until the permanent position was filled and that she would then move into a permanent position as Assistant Director of MSS." (Dkt. 1, ¶ 16.) Hoffman contends that Diaz verbally offered Hoffman the position of interim director during a meeting on January 23, 2022 and that Hoffman accepted. Hoffman also alleges that "it was agreed she would receive overload pay for performing additional duties as Interim Director of MSS." (Dkt. 1, ¶ 17.) Hoffman contends that students, faculty and staff opposed her appointment to interim director of MSS solely because she was white." (Dkt. 1, ¶ 25.) Hoffman claims she was forced to demote first from her position as interim director of MSS and then to demote from

5

her position as assistant director of MSS because of student, staff and faculty opposition to her in those positions because of her race. (Dkt. 1, ¶¶ 25, 43.)

**Hoffman was not interim director of assistant director of MSS.**

For the 2021-2022 fiscal year beginning September 1, 2021 and concluding June 30, 2022, Hoffman held a full-time, fixed-term professional academic staff appointment at UWEC in BB. (DPFOF ¶ 27.) The official title assigned to Hoffman's position was Associate Student Services Coordinator. The working title assigned to Hoffman's position (reflected in her contract letter) was Assistant Director College Success Coordinator. (DPFOF ¶¶ 28-29.)

On November 15, 2021, Hoffman's official job title (classification) was "Diversity and Inclusion Specialist."[3] (DPFOF ¶ 32.) There were no changes to Hoffman's official title or classification between November 2021 and September 2022. (DPFOF ¶ 33.) On January 6, 2022, Hoffman received a 2% pay plan adjustment which brought her compensation rate up to $42,840 effective January 2, 2022. (DPFOF ¶ 34.) There were no changes to Hoffman's full-time salary between January 6, 2022 and September 2022. (DPFOF ¶ 35.)

UWEC has many required processes for the creation of a position as well as the placement of a person in a position. Most relevant here, a Request to Fill (RTF) is a formal request to the University to spend money to create a new employment position, fill a vacant position, or otherwise use financial resources on employee positions. (DPFOF ¶ 13.) An RTF is not tied to an employee, but rather is a form to

---

[3] This change related to the Title and Total Compensation project by which UW System sought to bring consistency and clarification to job titles, position duties and compensation.

initiate a request for a particular employment position within the University. (DPFOF ¶ 14.) The initiator of the RTF must fill out the form telling the University why the employment position is needed, what the proposed cost will be, where the initiator believes the funding should come from, and any other details supporting the need for the position. (DPFOF ¶ 15.) The RTF process goes through multiple levels of approval, including an initial HR review, the supervisor, budget, the Chief Human Resources Officer for review, Executive Staff, (*i.e.*, Chancellor, Vice-Chancellors, etc). Following approval by Executive Staff, HR may post the position or proceed with the hire. Depending on the RTF, additional consultation and approval by shared governance bodies is required. (DPFOF ¶ 16.)

Initiating an RTF does not necessarily mean that the position will be approved, posted, or filled. (DPFOF ¶ 17.) If a RTF moves forward, a Personnel Action Request Form (PARF) is the action form that lists out the terms of the contract including the start date information, end date information (if the position is a term position), salary, funding stream, and demographic information. (DPFOF ¶ 19.) Once the PARF is completed, the RTF is complete. A contract letter will accompany the PARF. The contract letter will list out the official and working titles, start date, immediate supervisor, salary, and any other relevant information for the position. The contract letter will be sent to the employee. (DPFOF ¶¶ 19-20.)

An interim position may not require an external or internal search, but an RTF is still necessary for a complete HR record. (DPFOF ¶ 23.) To make the interim position official as to the title, compensation, and job responsibilities for the employee

7

taking on the interim position, the person making the appointment must initiate a PARF which must include the terms of employment (date range, salary, funding stream, etc.) and a position description. (DPFOF ¶ 24.) Once a PARF is finalized by HR, the employee will be compensated for the interim role and the employee will receive a contract letter acknowledging the change. (DPFOF ¶ 25.)

There is no RTF, PARF or letter of appointment relating to Diaz appointing Hoffman as interim director. Diaz completed an Overload Request Form on March 21, 2022 for additional duties absorbed by Hoffman since vacancies occurred in BB and OMA for the time period January 2022 through June 2022. Hoffman received a total overload salary[4] of $3,000. (DPFOF ¶ 58.)

On June 1, 2022 Diaz initiated a RTF for Assistant Director, Multicultural Student Services. The RTF proposed: "Blugold Assistant Director (Rochelle Hoffman) will serve with working title of Assistant Director, Multicultural Student Services (MSS). The official TTC title remains Diversity, Equity and Inclusivity Student Services Coordinator." The proposed salary was $50,000. (DPFOF ¶ 68.)

Following necessary approvals at the supervisor and budget levels, an HR representative sent an email to Executive Staff on July 22, 2022 asking for comments or concerns on three RTFs including "EDISA Multicultural Student Services – grant $7,160 (16.7%) additional duties increase to MSS Assistant Director Rochelle Hoffman." (DPFOF ¶ 69.) The RTF to change Hoffman's working title to assistant director of MSS and the proposed increase were on hold. (DPFOF ¶ 70.) On August

---

[4] Overload payments are used by the University to pay employees for additional duties/responsibilities assigned for a defined period with set start and end dates.

9, 2022, Diaz emailed Steinhorst asking if there were additional steps to complete the process for numerous hiring/transferring/changing pay requests for various EDISA employees including Hoffman. On August 18, 2022, Steinhorst responded that conversations about Hoffman's title and pay were continuing and that Steinhorst would be in touch regarding Hoffman's pay increase and whether it would be temporary, an overload, or some other pay structure. (DPFOF ¶ 71.) On September 8, 2022, an HR representative completed the RTF noting that the position had not been approved. An overload payment of $1,758 was processed for Hoffman for three months, (June, July, and August 2022) of additional duties. The overload payment amount was the differential between her salary $42,840 and $50,000, the salary stated in the assistant director of MSS RTF. (DPFOF ¶ 72.) On September 8, 2022, Diaz emailed HR that she did not want to proceed with the assistant director of MSS RTF. A PARF was never completed. There has never been an MSS assistant director position (working title or otherwise) at UWEC. (DPFOF ¶¶ 73-74, 204.)

**Hoffman's allegations of harassment.**

According to Hoffman, certain of her coworkers, and particularly Maggie Jensen, subjected her to racial harassment from approximately February 2022 to September 1, 2022. Hoffman also asserts that certain faculty, UWEC alumni and unnamed staff also subjected her to racial harassment during that time period. (Huck Decl. ¶ 5, Ex. 1037-002-003, 007-008.)

Hoffman contends that she was subjected to statements and conduct that amounted to a hostile environment. Details regarding the claimed harassment will

be discussed below, but generally, Hoffman cites to the following types of comments and conduct. Hoffman contends that a coworker, Maggie Jensen said she had problems with Hoffman as interim director because of Hoffman's "identity," was "insubordinate" and refused to share her calendar with Hoffman, which Hoffman attributes to her race. (Huck Decl. ¶ 5, Ex. 1037-003-004.) Hoffman points to statements made by students at one or more open houses presenting plans for the merger of BB and OMA in which some students asked Diaz about having a white people in leadership positions in EDI, including at least once having a student question Diaz about having a white person in the position of interim director. (Huck Decl. ¶ 5, Ex. 1037-002, 006-008.) Hoffman cites conversations faculty had with Diaz in February 2022 that Diaz relayed to her, and unspecified statements in meetings Hoffman did not attend but posits that the meetings would have included statements that were harassing towards her because of her race. Hoffman points to certain letters and emails drafted by faculty, a Student Senate resolution, media reports, and alumni social media postings, some of which she was aware of at the relevant time in 2022 and others that she only became aware of when she received emails in 2023 in response to her open records request.[5] (Huck Decl. ¶ 5, Ex. 1037-004-005.) Hoffman points to the presence of media reporting on events relating to the merger of BB and OMA in the space near her office that she found physically threatening and that the university's response to the media inquiries was to state that a white person could not serve as a spokesperson on the topic of BB and OMA.

---

[5] The documents that Hoffman primarily relies on have been provided to the Court so that the Court can review the full content of the materials itself.  (DPFOF ¶¶ 8,9, 106, 270-271, 273-274.)

Hoffman did not report this conduct through the channels provided for reporting conduct believed to be discriminatory or harassing before July 28, 2022. Hoffman does not criticize her supervisor, Diaz. (DPFOF ¶¶ 79, 100.)

**UW System investigates Hoffman's complaint.**

On July 28, 2022, Hoffman filed a race/color and hostile work environment complaint with UWEC following the complaint process established under UWEC's policies. (DPFOF ¶ 181.) In response to Hoffman's July 28, 2022 internal complaint, UWEC made UW System aware of the complaint. UW System was able to make an investigator available to UWEC. (DPFOF ¶¶ 188-189.) One of the reasons for UW System to assign an investigator is that the discrimination complaint was submitted by Hoffman and her direct supervisor at that time was Diaz, who was also O'Halloran's supervisor. Having an investigator assigned from the UW System would eliminate my having to potentially investigate the actions of her direct supervisor. (DPFOF 190.) O'Halloran was on vacation from August 6, 2022 through August 15, 2022. (DPFOF ¶ 191.) O'Halloran sent the July 28 complaint to the assigned investigator on August 17, 2022. (DPFOF ¶ 191.)

Ultimately, the UW System investigation found that there was insufficient evidence to show that the named respondents violated UWEC's Discrimination Harassment and Retaliation Policy. (DPFOF ¶ 268.)

**Hoffman Moves To SSS and the MSS Gen 100 course assignment**

On or around August 23, 2022, Hoffman told Lee that she had decided to leave MSS to take a position in Student Support Services (SSS). (DPFOF ¶ 208.) (As will

be discussed below, Hoffman contends that she did not want to leave MSS but was forced to do so.) Diaz approved the transfer on August 24, 2022. Hoffman began working in SSS on September 2, 2022. (DPFOF ¶ 209.) Her official title was Student Affairs Program Specialist. She received an annual salary of $52,000. (DPFOF ¶ 31.)

There is a general education course that is offered to students within the MSS Living Learning Community. A "living learning community" (LLC) at UWEC is geared towards student success, including a central theme; academic courses; special events, providing opportunities for growth and engagement; and service-learning hours. (DPFOF ¶ 210.) As part of their duties, MSS staff provides support to the MSS LLCs which includes teaching a 100-level general education course that is a required academic course for students in the MSS LLC. (DPFOF ¶ 211.)

If the MSS Gen 100 class is taught by a staff person within MSS, the teaching responsibilities are considered in load and no additional funds are required to pay the instructor.[6] If the MSS Gen 100 class is taught by a staff person not within MSS, MSS must pay an overload out of its budget. An "overload" generally refers to an additional payment made to staff for additional duties outside of their normal working duties. (DPFOF ¶ 212.) Before her departure from MSS, Hoffman would have been expected to teach the MSS Gen 100 course for the fall semester 2022 "in load." If Hoffman taught the MSS Gen 100 course while she was an SSS employee, Hoffman's understanding is that MSS would have to pay an overload to her out of

---

[6] In the spring semester 2022, Hoffman taught a Gen 100 class affiliated with BB. Hoffman did not receive any additional payment or overload for teaching the BB Gen 100 class in the spring semester 2022. (DPFOF ¶ 37.)

MSS's budget. Diaz was aware that having Hoffman teach the MSS Gen 100 class while she was an SSS employee would require funding from a different account string. (DPFOF ¶¶ 213-15.)

When Hoffman told Lee that she had decided to take a position in SSS, Lee needed to figure out who could be the instructor for the MSS Gen 100 course scheduled to start in approximately two weeks at the beginning of the fall semester. (DPFOF ¶ 216.) Shortly after Hoffman announced on August 23, 2022 that she was leaving MSS, Lee reached out to Jorgenson to discuss the need to get a new instructor for the MSS Gen 100 course. (DPFOF ¶ 217.) Jorgenson and Lee discussed that if Hoffman continued to teach MSS Gen 100, MSS would have to pay an overload. Lee knew that another MSS staff member, Maggie Jensen, had expressed interest in teaching. Because Jensen was a staff member within MSS, Jensen teaching would be "in load." (DPFOF ¶¶ 218-19.) Jorgenson told Lee that he had discussed having Jensen teach the MSS Gen 100 course with Diaz and that moving forward with having Jensen teach the MSS Gen 100 course was fine. (DPFOF ¶ 220.) In Lee's view, the MSS LLC and MSS Gen 100 course is a MSS program. It never occurred to Lee that the MSS Gen 100 course would leave with Hoffman just because Hoffman had prepared a syllabus. The MSS coursework and syllabus was created in MSS, so it is a resource available to anyone within MSS. (DPFOF ¶ 223.)

**Alleged retaliation in 2023 and 2024.**

Hoffman also contends that she was subjected to retaliation for having filed her internal complaint by her SSS supervisor, Joy Coates, who joined UWEC as the

Director of Student Support Services (TRIO Program) on September 1, 2022.  (Huck Decl.  ¶ 5,  Ex.  1037-009-010.)  Hoffman's  contentions  regarding  these  retaliation claims will be discussed below.

**Hoffman filed an ERD complaint on November 18, 2022.**

On November 18, 2022, Hoffman filed her ERD complaint. (DPFOF ¶ 275.) The ERD complaint describes acts alleged to be disparate treatment, hostile work environment and retaliation relating to events occurring between February 2022 and September 1, 2022. (DPFOF ¶ 276.) On November 7, 2023, Hoffman received a right-to-sue letter from the EEOC. (DPFOF ¶ 277.)

**Hoffman terminates her employment at UWEC.**

Hoffman submitted a notice of resignation from SSS and UWEC on August 19, 2024. Hoffman's last day at UWEC was September 3, 2024. (DPFOF ¶ 42.) Hoffman currently works a full-time position at Western Technical University, earning an annual salary of $65,000. (DPFOF ¶ 43.)

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Additional facts are discussed below as they are relevant to Hoffman's claims.

## STANDARD OF REVIEW

Under Federal Rules of Civil Procedure 56(a), "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The opposing party must support her assertions of disputed facts with citations "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249–50. Notably, facts are only viewed in the light most favorable to the nonmoving party where there is a genuine dispute about those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). That is, where a party's evidence is so clearly contradicted by the record as a whole that no reasonable jury could believe it, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

## ARGUMENT

Defendants are entitled to summary judgment in their favor on Hoffman's claims for the reasons set forth below.

## I.    Hoffman Cannot Establish That Defendants Subjected Her to Illegal Race Discrimination.

### A.  Legal standard for Hoffman's disparate treatment claims.

Hoffman brings claims for discrimination based on race against the Board of Regents under Title VII and against Schmidt and O'Halloran under § 1981 and the Equal Protection clause via § 1983.

Title VII, § 1981 and equal protection discrimination claims are generally analyzed in the same manner and share much of the same case law. *See, e.g., Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010) (Title VII, § 1981 and § 1983); *Hedrich v. Bd. of Regents of Univ. of Wisconsin Sys.*, 274 F.3d 1174, 1183 (7th Cir. 2001) (Fourteenth Amendment). There is, however, a distinction in the causation element—in Title VII cases the plaintiff must show that her protected status is a "motivating factor" in the employer's decision, but in a § 1981 claim, the plaintiff must show that her protected status is the "but-for cause" of the decision. *See Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (citation omitted). Generally, these laws prohibit the discrimination against employees in the terms or conditions of their employment because of that person's race. *See, e.g.,* 42 U.S.C. § 2000e-2a. Hoffman has the burden of proving intentional discrimination. *See Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1029 (7th Cir. 2003) ("Proof of intentional discrimination is required under a disparate treatment analysis.").

A plaintiff must prove three elements of a discrimination claim: (1) she is a member of a class protected by the statute, (2) she has been the subject of some form of adverse employment action, and (3) the employer took this adverse action on account of the plaintiff's membership in the protected class. *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (citing *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th

Cir. 2013); *see also Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 300 F. Supp. 2d 836, 851 (W.D. Wis 2004) ("Although the Fourteenth Amendment could be interpreted as extending to all differential treatment, the court of appeals has applied the 'adverse employment action' limitation to claims under the equal protection clause as well.").

"In discrimination cases, when a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race… or other proscribed factor caused the discharge or other adverse employment action." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (internal quotation and citations omitted). The legal standard used to evaluate a discrimination claim "is simply whether the evidence," considered as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's [race] . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The ultimate question applicable is whether a reasonable juror could conclude that the plaintiff would have been offered other terms or conditions of her employment if she was not a white person, "and everything else had remained the same." *Ortiz*, 834 F.3d at 764. The court must consider all the evidence and determine whether there is a basis for a reasonable factfinder to find that the employer took an adverse action against the employee because of their protected status. *Id.* at 765.

Although the Seventh Circuit continues to recognize "the framework for circumstantial evidence of discrimination adopted by the Supreme Court

in [*McDonnell Douglas Corp.*]" as one means for plaintiffs alleging discrimination to overcome a summary judgment motion, *see Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022), that avenue is foreclosed here. Hoffman cannot establish a necessary element of her *prima facie* case because she has not identified an individual outside of her protected class who was treated more favorably by defendants with regard to any relevant decision or action, *See Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022) ("Under the *McDonnell Douglas* framework, the fourth element of a *prima facie* case requires that the plaintiff show [s]he was treated less favorably than a similarly situated employee outside h[er] protected class").

Without the benefit of the presumption of discrimination that the *prima facie* case creates, the sole question for the Court to resolve with respect to Hoffman's disparate treatment claim is whether she has introduced evidence sufficient to permit a reasonable factfinder to conclude that her race—the fact that she is white—caused defendants to take any adverse action against her. *See Igasaki*, 988 F.3d at 957.

### B. Hoffman cannot establish that defendants subjected her to disparate treatment because she is white.

The gist of Hoffman's disparate treatment claims are the "demotions" she contends were unlawfully motivated by her race. Because she never held the positions from which she claims she was demoted, she cannot show an adverse employment action. Additionally, she cannot show that any action was taken against her by a decision-maker on the basis of her race.

### 1. Hoffman was not subjected to an adverse employment action.

To avoid summary judgment, Hoffman must show that she was subjected to an adverse employment action. The Supreme Court's recent decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) rejected a "material" adversity requirement for disparate-treatment claims.[7] The *Muldrow* Court held that Title VII's disparate-treatment provision "prevents injury to individuals based on status, without distinguishing between significant and less significant harms." *Muldrow*, 601 U.S. at 358 (internal quotation marks and alteration omitted). The appropriate inquiry under the disparate-treatment provision of Title VII[8] is whether the discrimination the plaintiff experienced gave rise to "some harm respecting an identifiable term or condition of employment." *Id.* at 354-55. A plaintiff must still show some harm but need not prove that the identified harm was "significant," "substantial," or "material." Plaintiffs must show that their employers treated them "worse" based on a protected characteristic. *Id.* at 355.

Thus, the question here is whether the harm Hoffman identifies is, among other requirements, an "identifiable term or condition of employment" and that there was "some harm" to her. Hoffman cannot show these two things. First, she cannot show an identifiable term or condition of employment related to her interim director and assistant director of MSS claims because no such positions ever existed. Thus,

---

[7] As the Seventh Circuit has recognized, the *Muldrow* decision affected its previous decisions that applied a materiality requirement to the element of an adverse employment action for disparate treatment claims. *See Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337 (7th Cir. 2024).

[8] It is not clear that *Muldrow* applies to disparate treatment outside of Title VII claims but because defendants are entitled to summary judgment on all of Hoffman's claims under the *Muldrow* standard, defendants assume for the sake of this motion that it also applies to the § 1983 claims against Schmidt and O'Halloran

Hoffman cannot show an "identifiable term or condition of employment" at all. Second, even accepting as true Hoffman's contention that she was forced to transfer to SSS, the specifics of the transfer do not rise to the level of an adverse employment action even under *Muldrow*.

### a. No identifiable term or condition of employment.

As to Hoffman's interim director claim, there is no dispute that the only director position offered by Diaz to Hoffman was on an "interim" basis.[9] (DPFOF ¶ 49.) Hoffman and Diaz agree that Hoffman had no interest in pursuing the director position of the department that would be created following the merger of BB and OMA. (DPFOF ¶¶ 51, 53.) At Diaz's request, Hoffman assumed some of the job responsibilities of the director while a replacement director was sought in exchange for an overload payment, reflecting a practical allocation of job duties during an interim period. (DPFOF ¶ 59.)

While it may be that Diaz intended to make an interim director appointment, which would have been within her authority to do, there are required processes that Diaz needed to follow to make that appointment effective. Here, none of those steps occurred. There was no RTF, no PARF, no letter of appointment setting forth the terms of the appointment, the length of the appointment, compensation, job duties or any other terms of the interim appointment. (DPFOF ¶ 279.) The only paperwork

---

[9] As of January 2022, there was no such department of what became "MSS" further undermining Hoffman's assertion that she was its interim director. Was she appointed the interim director of BB, OMA or both? BB and OMA still existed as separate departments with separately supported funding streams through June 30, 2022, approvals for the new unit had not been obtained through shared governance, and a new department name had not been selected util sometime during spring semester 2022.

submitted by Diaz related to a request for overload payment for additional duties Hoffman was performing during the temporary reallocation of work duties following the departures of several BB and OMA staff members. Diaz submitted this paperwork in March 2022. It says nothing about Hoffman assuming an interim director role. (DPFOF ¶ 58.) At most, Hoffman briefly used a temporary working title of "interim director" with the approval of Diaz.

Similarly, the assistant director position in MSS that Hoffman contends she was forced out of was never a position at UWEC. (DPFOF ¶ 204.) Hoffman testified:

> Olga and I had discussed like what does that kind of look like when we have the kind of merged department, the created department, I was previously the assistant director in Blugold Beginnings and as far as the position of assistant director, moving that into a permanent full-time position was the best I think equivalent option. And so the decision was made to do that job description and submit that part for hire for, you know, June 1. That was approved by HR on July 15 and approved by payroll.

(DPFOF ¶ 53.)

Whatever Hoffman and Diaz might have spoken about, Hoffman's understanding of the supposed creation of the position of assistant director of MSS and her appointment to it are incorrect and contradicted by the documentation. On June 1, 2022 Diaz submitted an RTF to provide a working title for assistant director of MSS for Hoffman. (DPFOF ¶ 68.) The RTF was never approved although Hoffman again received an overload payment for the additional duties she performed. (DPFOF ¶¶ 72-75.) There has never been the position of assistant director of MSS.

Because the positions from which Hoffman contends she was demoted never existed and she never held them, Hoffman cannot show an identifiable term or

condition of her employment, whatsoever, related to her disparate treatment claim. *See Muldrow*, 601 U.S. at 354-55 (stating that the challenged action must "respect[] an identifiable term or condition of employment.").

b. **Hoffman cannot show she was treated worse and suffered some harm**.

*Muldrow* dealt specifically with an allegedly discriminatory transfer. Notably, the Court did not wholesale adopt plaintiff's argument that the fact of a transfer alone constitutes discrimination. Rather, the Court reasoned that, to be actionable under Title VII, a "transfer must have left [the Plaintiff] worse off, but need not have left [the Plaintiff] significantly so." *Id*. at 355.

Given the recency of the *Muldrow* decision, there are limited cases addressing what "some harm" in which employers treated a plaintiff worse based on a protected characteristic at the summary judgment stage. In *Phillips v. Baxter*, No. 23-1740, 2024 WL 1795859, at *3 (7th Cir. Apr. 25, 2024), the Seventh Circuit examined the specifics of the reassignment alleged to be the adverse employment action supporting the disparate treatment claim. The *Phillips* court concluded that plaintiff's "reassignment from the processing hub to the local office was not an adverse action because there is no evidence that it left him "worse off" with respect to the terms and conditions of his employment. *Id*. (citing *Muldrow*). As the *Phillips* court explained, "the reassignment did not change his position, job duties, salary, or benefits, and the new office was even in the same building." *Id*. (citing *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470–71 (7th Cir. 2018)). The Seventh Circuit otherwise rejected the idea that the rest of plaintiff's complaints such as changes in his duties within

22

the scope of his role, an inability to make long-distance phone calls or access some computer applications, and a pre-disciplinary meeting that never happened were anything other than "mostly temporary inconveniences" that did not affect the terms or conditions of his employment so as to be an adverse employment action. *Id.* (*citing McCurry v. Kenco Logistics Servs., LLC,* 942 F.3d 783, 789 (7th Cir. 2019)).

Thus, the question for the Court is whether the specifics of Hoffman's claim constitutes "some harm" in the circumstances here. They do not. Beginning in fall 2021, she used the working title of assistant director of BB. (DPFOF ¶ 29.) BB was merged out of existence as of summer 2022. On November 15, 2021, as a result of the Title and Total Compensation project, Hoffman's official job title (classification) was "Diversity and Inclusion Specialist." (DPFOF ¶ 32.) There were no changes to Hoffman's official title or classification between November 2021 and September 2022. (DPFOF ¶ 33.) Notably, Diaz's June 1, 2022 RTF was simply for a working title and a salary increase to $50,000. (DPFOF ¶ 68.) Hoffman's official title and classification as a coordinator would have remained unchanged even if the RTF had been ultimately approved. Her salary was not decreased on her move to SSS; rather, it was increased. Relating to the temporary reallocation of duties following the departure of other staff pending an official search for a director, Hoffman received additional overload pay as agreed for the additional duties she performed. There were no other changes to the working hours, schedule or terms of Hoffman's employment.

Hoffman also argues that she loved her job in MSS and was "forced" to leave her position in MSS to take a position in SSS. For purposes of summary judgment,

defendants accept that there are disputed facts regarding Hoffman's move from MSS to the SSS position relating to whether the move was made at Hoffman's request with Diaz's approval. Even accepting Hoffman's version of the facts, Hoffman's move to SSS does not constitute some harm sufficient to constitute an actionable adverse employment action. On her effective start date in SSS, Hoffman's official title changed to Student Affairs Program Specialist, but Hoffman has not alleged that the title difference between Student Affairs Program Specialist is some harm compared to her prior title of Diversity and Inclusion Specialist. It is not. Some of her job duties changed, but Hoffman's telecommute and hours remained unchanged, and her office location remained on UWEC's campus, albeit in a slightly different place. Her annual salary increased from $42,840 to $52,000. (DPFOF ¶ 31.)

Hoffman's claim of some harm relies on the Court accepting that she held the working title of MSS assistant director. But that position was never approved. It does not exist to this day. (DPFOF ¶¶ 73, 204.) Hoffman compares a working title of MSS assistant director to a Student Affairs Program Specialist, but this is a factually inaccurate predicate. Hoffman's title was Diversity and Inclusion Specialist before she moved to SSS and received the title Student Affairs Program Specialist.

### 2. Hoffman cannot show that any decision maker took any action against Hoffman due to her race.

Setting aside the problems with Hoffman's assertion that she was promoted and then demoted to an interim director and then demoted from both roles, Hoffman cannot show any *decisionmaker* took any action against Hoffman due to her race or were motivated by racial animus. Because discriminatory motive is required in

disparate-treatment Title VII claims, *see, e.g.*, *Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335–336, n.15 (1977); *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012), to survive summary judgment, Hoffman must show that the *decisionmakers* were motivated by racial animus. She must provide "evidence that the *decisionmaker* has acted for a prohibited reason. A decisionmaker is the person responsible for the contested decision." *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir.2003) (emphasis in original) (internal quotation and citation omitted).

Hoffman cannot do so. Here, Diaz was the decision maker as it related to any position Hoffman had or did not have for the period of time beginning in January 2022 until Caitlin Lee's appointment as MSS director. Diaz was the one who initiated the request for additional payments relating to Hoffman's additional duties. Diaz was the one who chose not to submit an RTF to fill as to an interim appointment or to complete necessary steps to provide a letter of appointment to Hoffman. Diaz is the one who initiated the RTF for only a working title of assistant director of MSS for Hoffman in June 2022. Diaz is also the one who initiated the RTF for Hoffman's move to SSS. Nowhere does Hoffman contend that Diaz took any action against Hoffman due to her race or that Diaz harbored any racial animus towards Hoffman. Hoffman asserts that the actions Diaz took (*i.e.*, supposedly to "demote" Hoffman from the interim director position) were taken to shield and protect her, not on account of Hoffman's race. (DPFOF ¶¶ 63, 79, 80.) Similarly, there is no evidence that Diaz's actions to effectuate Hoffman's move from MSS to SSS were done based on Diaz having racial animus towards Hoffman.

Hoffman does not contend that Schmidt or O'Halloran were the decision-makers as it relates to Hoffman's interim director claim. As to Schmidt, there is no evidence that Schmidt was a decisionmaker whatsoever in any employment action, including the MSS assistant director position, relating to Hoffman's disparate treatment claims. (DPFOF ¶¶ 261-63.) Nor is there any evidence that Schmidt displayed any racial animus towards Hoffman. Diaz confirms that Schmidt "agreed with her" that individuals could not be hired based solely on their race. (DPFOF ¶ 96.) Hoffman may point to her contention that Diaz contends that Schmidt told Diaz before Hoffman filed her July 28, 2022 complaint that Hoffman filing an internal complaint would add "fuel to the fire." But even accepting this as true, such a statement does not reflect racial animus; it reflects that Hoffman's complaint would potentially inflame and draw more attention to the ongoing campus concern with the merger of BB and OMA, the structure of EDISA, and Diaz's handling of these matters in her leadership of EDISA.

Even accepting as true Hoffman's contention that O'Halloran and HR instructed Hoffman that she needed to be moved out of MSS, Hoffman does not contend that they were motivated by racial animus. Rather, Hoffman contends that they took such action because of the complaints about harassment aimed *at* Hoffman (*i.e.*, the anonymous complaint filed against Hoffman). Hoffman was upset about the behavior aimed at her and, according to Hoffman, she was in a hostile environment. As discussed below in the section addressing hostile work environment, Hoffman criticizes the defendants for not doing "more" for her regarding the hostile work

environment but does not contend that they took action because of racial animus they had towards her.

Hoffman may argue that O'Halloran demonstrated racial animus towards her relating to her contention (disputed by O'Halloran) that in early June 2022 in an impromptu hallway conversation, O'Halloran told Diaz that Diaz could not pay Hoffman more than Jensen, connecting that comment to their race. Hoffman's claims are unrelated to pay and nothing in the record shows that Diaz, who initiated the RTF, took any action against Hoffman because of this alleged conversation.

The only racial animus Hoffman identifies comes from students, coworkers, alumni and select BIPOC faculty. Even if any of the comments and written materials can be considered to be racial animus against Hoffman, there is no evidence that any of them had any type of decision-making role in the employment actions Hoffman contends discriminated against her on the basis of her race. *See Schandelmeier - Bartels v. Chicago Park Dist.*, 634 F.3d 372, 378–79 (7th Cir. 2011) (holding that plaintiff must show that a decisionmaker acted for a prohibited reason to prevail on a Title VII claim); *Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 899-900 (7th Cir. 2016) (affirming summary judgment in favor of employer where plaintiff identified a laundry list of events he experienced but no evidence that the decision maker in the adverse employment action had anything to do with those events). Because Hoffman cannot meet this burden, her disparate treatment claim fails.

## II.    Defendants are entitled to summary judgment on Hoffman's claim for a hostile work environment based on race.

### A.  Hoffman's Burden

Hoffman brings claims for race-based harassment. To establish an actionable hostile environment claim, a plaintiff must show (1) that the work environment was both subjectively and objectively offensive; (2) the harassment was based on her race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *See Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005); *Paschall v. Tube Processing Corp.*, 28 F. 4th 805, 813–14 (7th Cir. 2022) (cleaned up).

In assessing whether the conduct at issue rises to the level of an objectively offensive environment, courts consider various factors, including "the frequency of the discriminatory conduct, how offensive a reasonable person would deem it to be, whether it is physically threatening or humiliating conduct as opposed to verbal abuse, whether it unreasonably interferes with an employee's work performance, and whether it was directed at the victim." *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013) Although the harassment "need not be both severe *and* pervasive" to create a hostile environment, *see EEOC v. Vill. at Hamilton Pointe LLC*, 102 F.4th 387, 402 (7th Cir. 2024), isolated incidents of racial harassment are rarely enough unless they are exceptionally egregious. *See Paschall*, 28 F.4th at 815 (describing n-word as "pure anathema to African Americans" and observing "there may well be a situation in which the one-time use of the N-word can be found to be severe enough to warrant liability"). Indeed, to satisfy the standard of severe or pervasive, the conduct at issue must be "extreme." *See EEOC v. Costco Wholesale*

*Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "Offhand comments, isolated incidents, and simple teasing" do not create a hostile environment. *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012); *see also Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018) ("[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace.").

Courts must take into account the "totality of the circumstances" and consider the context in which the claimed harassment occurs. *See Vill. at Hamilton Pointe*, 102 F.4th at 402. Thus, statements that are not directed at the plaintiff are presumed to have a lesser impact. *Id*. In addition, the source of the harassing statements is relevant: harassment by a plaintiff's co-workers has a lesser impact than harassment by an indirect supervisor, which in turn has a lesser impact than harassment by a plaintiff's direct supervisor. *Id*. & n.6. The nature of the workplace is relevant. *See Robinson v. Sappington*, 351 F.3d 317, 330 (7th Cir. 2003) ("The specific circumstances of the working environment and the relationship between the harassing party and the harassed ... bear on whether that [objectively hostile] line is crossed."). Finally, in a claim involving a racially hostile environment, "the alleged harassment must be 'sufficiently connected to race' before it may reasonably be construed as" harassment based on plaintiff's membership in a protected class. *See Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863-64 (7th Cir. 2005). While a plaintiff alleging a hostile work environment claim need not show that "the

complained-of conduct was explicitly racial," she "must show it had a racial character or purpose" and "there must be *some* connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Paschall*, 28 F.4th at 814 (internal quotations and citations omitted).

But Title VII is not concerned with harassment in the abstract. Instead, it requires employers to address the problem at hand: "[i]n assessing the corrective action, our focus is not whether the perpetrators were punished by the employer, but whether the employer took reasonable steps to prevent future harm." *Porter v. Erie Foods Intern., Inc.,* 576 F.3d 629, 637 (7th Cir.2009); *Saxton v. AT & T Co.,* 10 F.3d 526, 536 (7th Cir. 1993) ("Title VII requires only that the employer take steps reasonably likely to stop the harassment."). "Thus, when the harassment appears unlikely to be repeated due to an employee's apparent resignation, the employer is relieved of its duty to take additional remedial measures." *Stuyvenberg v. GC of Appleton, Inc.*, No. 09-C-461, 2010 WL 3766529, at *4 (E.D. Wis. Sept. 22, 2010).

The ruling in *Muldrow* altered the standard for establishing certain adverse employment actions in disparate treatment cases, but did not impact hostile work environment claims. *Muldrow* does not redefine what must be shown to make out a hostile work environment claim. The phrase is not even used in the opinion. *See, e.g.*, *Phillips*, 2024 WL 1795859, at *3 (holding, post-Muldrow, that "[c]onduct must be and 'severe or pervasive' to be actionable under a hostile work environment theory); *Anderson v. Amazon.com, Inc.*, No. 23 CV 8347, 2024 WL 2801986, at *10 n.1

30

(S.D.N.Y. May 31, 2024) *17 ("*Muldrow* did not address the hostile-work-environment and constructive-discharge theories ..., so the Court applies existing Second Circuit law with respect to those arguments.").

## B. The conduct about which Hoffman complains.

Hoffman does not attribute any harassment to her supervisor, Diaz, or any of the named defendants. Hoffman's claims relate to coworkers, students, faculty and third parties (alumni).

Hoffman's coworker harassment allegations are primarily based on comments attributed to Jensen. Hoffman has identified four times that she states Jensen conveyed some sort of issue with Hoffman's identity, which Hoffman understood to be about her race. The first time, Hoffman contends that Jensen told her that Hoffman's identity was a problem for her when discussing Jensen's upset at not being asked to be the interim director as the longest serving staff of color. (Huck Decl. ¶ 5, Ex. 1037-003.) The second and third time occurred after an open house in February, and also after the Student Senate resolution. Hoffman asserted in her response to interrogatories that Jensen stated that she agreed with the students to not include white people in the OMA office and that Jensen did not disagree with the students regarding the Student Senate resolution. (Huck Decl. ¶ 5, Ex. 1037-003-004, 007-8.) But in her deposition, Hoffman admitted that Jensen did not say she agreed with the students regarding not having white people in the office, but that Jensen agreed that it was important to listen to what the students were saying. Jensen did not say that she agreed with student comments regarding opposing having a white person in EDI

leadership roles. (DPFOF ¶ 112-13.) The fourth occasion occurred on July 27, 2022 when Hoffman contends that Jensen "verbally berated" her "in an insubordinate manner, complaining about me, for instance, as her supervisor, for looking at her calendar." Hoffman attributes Jensen's "entire diatribe" as "meant to demean [Hoffman] as a white person. (Huck Decl. ¶ 5, Ex. 1037-007-8.) But nothing in the statements attributed to Jensen is connected to Hoffman's race. Jensen was upset that Hoffman was looking at her calendar.

Hoffman and Jensen did not have a positive working relationship. This went both ways. Jensen sought assistance from HR and the Affirmative Action Office. She received information on her options for proceeding, including the possibility that if she was unhappy, she could resign. (DPFOF ¶¶ 123-24.) Hoffman and Jensen's work styles appeared to conflict. For example, Hoffman submitted in support of her internal complaint a long email from Jensen that Hoffman perceives as demonstrating Jensen's animosity towards her on the basis of race, but a review of the email itself shows nothing that reflects a racial basis. Rather, Jensen disliked Hoffman texting her, and feels that Hoffman purposefully excludes coworkers from meetings and fails to solicit input from the experiences of others in the group. (DPFOF ¶ 267.) Similarly, calendar permission settings are unrelated to Hoffman's race. Furthermore, Hoffman's complaints that Jensen's behavior towards her was motivated by racial animus are further undermined by evidence that Jensen simply opposed the BB and OMA merger, was generally obstinate and could be rude and unprofessional to many people, regardless of their race. (DPFOF ¶¶ 86, 120, 126-33.)

Hoffman also identifies a statement made by a coworker in mid-August 2022, in which staff discussed the options of dividing the student caseload into equal numbers, as Hoffman wanted to do, or by affinity groups, as a MSS coordinator wanted to do. When Hoffman asked, "where do I fit in", she contends that Kearnen responded, "you don't, everyone is questioning the validity of your presence in this office." (Huck Decl. ¶ 5, Ex. 1037-008.) While this comment is rude and, in the context, could be connected to Hoffman's race, it is also within the context of the ongoing discussion for the BB and OMA merger regarding Diaz's decision on staffing. It was a one-time statement by Kearnen. Hoffman announced she would leave MSS the next day, creating physical separation between the two of them which would prevent further such comments by Kearnen to Hoffman in staff meetings.

Hoffman's other complaints regarding her coworkers are minor with no indication they are related to Hoffman's race. They include such things as saying hello on September 26, 2022 to Kearnan and another MSS coordinator, Anthony Wallace, but that they did not respond or make eye contact with Hoffman during an admissions presentation. (Huck Decl. ¶ 5, Ex. 1037-008.) Nothing connects this behavior to race or rises to the level of objectively harassing.

Hoffman also cites the comments made by students as a contributing factor in her hostile environment. (Huck Decl. ¶ 5, Ex. 1037-002.) These comments were primarily made during open houses developed to provide information to students and other campus constituents about the plans for the merger of BB and OMA. There were four open houses, although Hoffman appears to only identify comments she

claims were harassing at the first one. As Hoffman describes it: "During the open house on February 14, 2022, with more than 50 people in attendance, one student intern said, "You hired a white woman as the interim director?" and another student intern asked Diaz whether they "personally feel that white staff can do as effective a job as a person of color, within a space for people of color." In her interrogatory response, Hoffman averred that "Besides Ms. Diaz, no one spoke up in my defense or rebutted the implication that my color or race did not impede my qualifications for the position." (Huck Decl. ¶ 5, Ex. 1037-002-003.) However, in her deposition, Hoffman concedes that only Diaz addressed the open house attendees. (DPFOF ¶ 100.) Hoffman testified that Diaz addressed these questions by, essentially, defending Hoffman, and that Diaz responded to explain that hiring would not be done just based on race. (DPFOF ¶ 100.) Diaz considers herself qualified to field such questions and did not allow the comments to stand unchallenged. (DPFOF ¶ 101.) Hoffman does not have any criticisms of the explanation given by Diaz. (DPFOF ¶ 100.) Diaz also ensured that she was the only person responding to comments at open houses to protect other staff members. (DPFOF ¶ 102.)

While Hoffman refers generally to comments from faculty and staff supposedly made at open houses, Hoffman does not identify any such specific comment in her response to interrogatories and cannot identify any verbal statement made to her or in her presence by a faculty member that she contends were discriminating or harassing against her on the basis of her race or that related to her identity as a white person at an open house. (DPFOF ¶ 104.) Hoffman refers to a statement made by a

faculty member in a meeting with Diaz in February 2022. Diaz informed Hoffman that faculty expressed to her their concern with having a white woman as the director of an EDI leadership position and expressing their concern for the optics of what that looks like to have a white person in a multicultural student service position. (DPFOF ¶ 91.) But Diaz acknowledges that the meeting related to a letter sent by certain BIPOC faculty to Diaz about retention and other long-standing matters relating to race on campus that had nothing to do with Hoffman. (DPFOF ¶¶ 88, 92, 93.) Diaz cannot recall who used the word "optics." While comments made outside Hoffman's presence can be considered for hostile work environment, such comments are less severe, and while the term "optics" may obliquely refer to race, it is not objectively offensive on its own. *See Vill. at Hamilton Pointe*, 102 F.4th at 402 (explaining statements that are not directed at the plaintiff are presumed to have a lesser impact); *Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 902-903 (7th Cir. 2018) (explaining that the weakest evidence in plaintiff's hostile work environment claim are comments made to others about which plaintiff heard).

Hoffman asserts she was subjected to harassment through her exposure to written materials and statements authored by media, alumni and some faculty members and a Student Senate resolution. These materials have all been presented to the Court for the Court's review, but overall, the content of the materials and letters by the faculty are not objectively offensive or aimed at Hoffman. The fact that they discuss issues connected to race at UWEC do not make the letters race-based harassment aimed at Hoffman. For example, faculty members crafted a letter to

colleagues, dated June 14, 2022, asking for "attention to a serious matter" that was leaked to the media. (DPFOF ¶ 274.) The letter addresses several areas of concern and emphasizes an overarching desire to "ensure that EDISA operations are as rigorous and student-centered as the finest learning in our classrooms." The letter wrote about the need for recruitment and retention of diverse members of the campus community, and cited the following concerns:

> "(1) the marginalization of our students served by EDISA, especially our students of Color; (2) the resignations of multiple EDISA staff members, especially colleagues of color; (3) the disregard for collaboration and shared governance in EDISA decision making".

(DPFOF ¶ 274.)

There is no mention of Hoffman in the letter, nor Hoffman's appointment as Interim Director of MSS. Hoffman highlights this letter as evidence of discrimination because of the focus on students of color. But campus discussion of topics related to race is not equivalent race-based harassment aimed at Hoffman. As reading the letter shows, it is not aimed at Hoffman at all. Further, the letter itself states the authors' belief "that EDISA is a unit whose outreach should extend to every part of our university, but this charge requires a respect for shared governance and an authentic desire for relationship-building. We have witnessed neither…" (DPFOF ¶ 274.)

Other conduct identified as harassing by Hoffman includes an anonymous complaint filed by a student. (DPFOF ¶ 143.) But any person can file a complaint if they are concerned they have been discriminated against, just as Hoffman herself did. Because it was anonymous, the complaint was not investigated further. Hoffman also cites to several emails on which she was not a recipient (and only received a copy

of the email through a subsequent open records request). (DPFOF ¶ 114.) Defendants acknowledge that conversations and documents of which Hoffman had no knowledge of at the time may be cited in support of her harassment claim, the Court may still consider that Hoffman was not a recipient or participant in these communications, lessening any perceived offensiveness because they were not aimed at her. *Johnson*, 892 F.3d at 902-903; *Vill. at Hamilton Pointe*, 102 F.4th at 402.

Hoffman contends that the UWEC director of public relations, Mike Knuth, held a meeting in response to the media inquiries and prohibited her from answering reporters' questions. In her response to interrogatories, Hoffman stated that: "Knuth, however, stated that because Anthony [Wallace] was a black staff member, he could give an interview and speak on behalf of the office. The term "optics" was consistently used to explain why a white person as a director was the issue. Therefore, UWEC could not have a white person as the spokesperson for the department." (Huck Decl. ¶ 5, Ex. 1037-006-007.)

But in her deposition, Hoffman conceded that Knuth never said that "the optics of having a white woman was consistently used to explain why a white person as a director was the issue." (DPFOF ¶ 141.)  Nor did he say that "UWEC could not have a white person as a spokesperson for the department." (DPFOF ¶ 139.) The basis for her contention that UWEC could not have a white person as a spokesperson for MSS is as follows:

> Q. I need to understand if you're attributing that statement to Mike Knuth, who was a university employee specifically.

A. The optics of -- did he specifically say this in a training, no, but that was the perception that I had received based off of him asking Anthony, who was a black coordinator, to be the spokesperson for MSS. Why wouldn't --

Q. So you believe Mr. Wallace was chosen solely because he was a black man and not because he had the qualifications to do so, is that your testimony?

A. I think that it was interesting that they wouldn't ask the assistant director to make comments or include me in media training and instead a coordinator that had been employed for a month and was just a recent graduate as a student.

Q. Had you expressed during the training that you had found it fearful to have the media show up on campus?

A. Definitely.

Q. Could that possibly have been a reason why you weren't chosen to be the spokesperson speaking to the media?

A. My concern was about having the ability for, you know, the public to be in the office.

Q. And you didn't want to be forward facing that you would have publicity on you, right?

A. Sure.

(DPFOF ¶¶ 139-142.)

As shown above, and through a review of the materials submitted for the Court's review, Hoffman's allegations regarding the alleged harassing conduct are frequently not borne out by the facts developed in the case.

### C. Looking at the totality of the circumstances, Hoffman cannot meet her burden to show that she was subjected to a hostile work environment.

Hoffman's claims of a racially hostile environment fail. She was not subjected to an environment that was objectively offensive. Much of what plaintiff points to as harassment based on race cannot be construed as race-based, and the record does not reflect severe or pervasive harassment.

The evidence does not show that the statements and conduct were discriminatory, nor that they were objectively offensive. Little of the conduct Hoffman

complains of is sufficiently connected to her race. To find that Hoffman was subjected to a racially hostile environment, there must be evidence that she was subjected to harassment based on membership in a protected class, *i.e.,* because she is white. All or almost all the comments and discussions Hoffman appears to complain of do not fit the bill—talking about race, concerns about the recruitment and retention of diverse staff and university administrators' perceived failure to listen to the students being served or to follow through on prior strategic planning is not race-based harassment. Nor is expressing opposition to a proposed merger of BB and OMA, the elimination of office space, or the pacing of the merger and perception that it did not allow for consultation with stakeholders race-based harassment.

Considering the totality of the circumstances, the conduct in this case was neither severe nor pervasive. As to severity, nowhere does Hoffman claim racial slurs or racial epithets were hurled at her.none of the conduct at issue was physically threatening or humiliating. Hoffman asserted that she felt physically unsafe because of the presence of media in the office and the attention that publicity of having media covering the story, but she admits that no member of the media ever physically threatened her. (DPFOF ¶ 138.)

It was not pervasive. The conduct did not preclude Hoffman from completing her job duties. Hoffman received a favorable performance evaluation in June 2022. (DPFOF ¶ 39.) Construing the facts in the light most favorable to Hoffman, on a handful of occasions, her coworkers and UWEC students made comments regarding having white people working in this area. She was present for student comments at

four open houses, two of which included statement(s) questioning or opposing having a white person appointed without a search process to a leadership position. Her supervisor, the Vice-Chancellor of EDISA, responded at the time to oppose such student statements. Hoffman was exposed to a non-binding Student Senate resolution. The Student Senate resolution did contain three sections among the more than 50 clauses that could be considered objectively offensive and race-based. (DPFOF ¶ 106.) However, those comments occurred in a much larger document in which students expressed their opposition to the BB and OMA merger for many reasons, most of which were unrelated to their statements that could be considered objectively offensive. However, this student resolution must be viewed in the context of a campus, where many ideas are debated in an educational setting, just as rough language in a workplace known for poor language must be considered as part of the totality of circumstances. The nature of the workplace is relevant. *See Robinson* 351 F.3d at 330 ("The specific circumstances of the working environment and the relationship between the harassing party and the harassed ... bear on whether that [objectively hostile] line is crossed.").Hoffman was also exposed to social media posts by certain BIPOC alumni who opposed the merger, who challenged the perceived "whiteness" in EDI, and who used offensive language, but Hoffman does not contend that UWEC had any control over the social media posts or that they were issued or posted by UWEC or any of its administrators. (DPFOF ¶ 264.) To characterize exposure to such viewpoints and ideas as "severe" harassment creating a "hostile environment" would improperly thrust the court into the role of arbitrating "the

validity and propriety of [ ] controversial contentions" about race and society. *See Deemar v. Bd. of Educ. of City of Evanston/Skokie*, No. 21-CV-3466, 2024 WL 3757169, at *8 (N.D. Ill. Aug. 9, 2024).

There were only four open house meetings over the course of approximately three months and one challenged student senate meeting. The other matters were being discussed on campus and in the news because the BB and OMA merger affected campus and touched on many other issues relating to EDI at UWEC that were of great public interest, but that doesn't make it a matter of pervasive harassment towards Hoffman. (DPFOF ¶ 273.) As to her interactions with her coworkers, Hoffman generally alludes to a feeling that the harassment was constant, but she identifies only a handful of specific interactions, several of which, as discussed above were minor or fleeting comments that did not involve racial epithets or were in any way threatening towards Hoffman. Several incidents – calendar sharing, saying hello at a reception – have no apparent no connection to Hoffman's race. Hoffman's office (on the days she did not telecommute) was not physically located in the same space as the coworkers she says harassed her until some point in May so there was physical separation from them making it physically unlikely that the comments could have pervasively infiltrated Hoffman's work bubble. (DPFOF ¶ 55.)

Racial harassment did not pervade Plaintiff's employment environment. To that point, courts have granted summary judgment against plaintiffs alleging conduct far more severe and/or pervasive than what occurred here. *See, e.g., Vill. at Hamilton Pointe*, 102 F.4th at 408, 410, 416, 418, 420, 426 (finding no severe or

pervasive conduct where employees, *inter alia*: viewed assignment sheet stating "No African American Males to Provide Care" for three consecutive days; saw an assignment sheet that said "no blacks allowed"; hearing residents "use racial slurs on multiple occasions," including the N-word;  being told by white coworker she "was not cleaning up after these [n-words]"; hearing a resident use "the N-word three to five times," including statement "she did not want care from an N-word"; being called "'black B' and the N-word" by a resident); *Ford v. Minteq Shapes and Servs., Inc.*, 587 F.3d 845, 846-48 (7th Cir. 2009) (finding conduct not severe or pervasive where (black) plaintiff's coworker referred to him as "black African-American" or "black man" numerous times per day for fourteen months, a supervisor called him "a gorilla", and another supervisor told him he "didn't have to worry about losing his job because [defendant] wanted to appear integrated"); *Ammons v. Dart*, No. 16-CV-7770, 2018 WL 2096372, at *4 (N.D. Ill. May 7, 2018) (finding conduct not severe or pervasive where white coworker "squeezed [black] Plaintiff's breast" on three occasions and another white coworker "used the N-word in Plaintiff's presence" on three occasions).

In weighing the severity and/or pervasiveness of the conduct Plaintiff experienced, it is essential that the Court set aside any statements or episodes that bear no relationship to Plaintiff's race. Even if the Plaintiff could persuade a jury that such episodes were severe or pervasive, it would not move the needle for her discrimination claims. Harassment unconnected to her race or some other characteristic protected under Title VII is simply not actionable.

**D. There is no basis for employer liability.**

Absent evidence that Defendants had notice the Hoffman was being subjected to a hostile environment, her claims fail. Hoffman cannot make such a showing.

For Title VII purposes, the existence of severe or pervasive racial harassment is not, by itself, sufficient to establish the employer's liability. *See Vill. at Hamilton Pointe LLC*, 102 F.4th at 403. Whether the employer is liable for such harassment depends on both the status of the harasser and the employer's awareness of the harassment. *Id.* at 402. Where, as here, the harassment was not perpetrated by Plaintiff's supervisor, the employer is only liable for any harassment to the extent it had notice or knowledge of the harassment. *Id.* at 403. An employer cannot be expected to correct harassment based on a protected characteristic unless the employee makes a concerted effort to inform the employer that a problem exists. *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014 (7th Cir. 1997). Therefore, notice or knowledge of the harassment is a prerequisite for liability. *Id.* To survive summary judgment, the plaintiff must present evidence to show that she gave the employer enough information to make a reasonable employer think there was some possibility that she was being harassed based on a protected characteristic. *Zimmerman v. Cook Cty. Sheriff's Dept.*, 96 F.3d 1017, 1019 (7th Cir. 1996). It is also possible to establish notice through the complaints of other employees or inferring knowledge based on the "sheer pervasiveness" of the harassment. *Id.* When deciding whether an employer had notice of harassment, where an employer has established a set of procedures for reporting complaints about harassment, employees are expected "to follow that policy in order to provide notice sufficient for the employer to be held responsible...." *Vill. at*

43

*Hamilton Pointe LLC*, 102 F.4th at 403-04. An employer has constructive notice of harassment if the harassment is sufficiently pervasive and obvious such as when much of the harassment about which the employee complains she was subjected to was public, deliberately exhibitionist or openly hostile behavior. *Id.* at 404. Moreover, an employer's knowledge of episodes of alleged harassing behavior is not enough unless such behavior "puts the employer on notice of the existence of an actionable hostile work environment." *Id.*

Before Hoffman's filing of an internal complaint on July 28, 2022, in keeping with UWEC's written policy on reporting, nothing in the record satisfies this notice/ knowledge element. As it relates to comments and conduct attributed to her coworkers, Hoffman was the one in the position to report such conduct. Hoffman did not do so at any time before filing her internal complaint on July 28. Hoffman never complained directly to her supervisor, Diaz, that she was subjected to racial harassment. While Hoffman and Diaz have testified that they had discussed events that occurred at various points in 2022, neither of them identify any specific complaints Hoffman made to Diaz or action she asked Diaz to take on her behalf. Whatever Hoffman may have said, or Diaz may have observed herself, Hoffman has no criticism of how her supervisor, Diaz, handled the events about which Hoffman complained in 2022. Indeed, Diaz, who was and remains Hoffman's strong advocate, apparently observed nothing that she thought required her to take any specific action beyond what she did (*i.e.*, being the direct supervisor of BB and OMA, leading open houses and responding to the comments, and generally being the forward-facing

person for BB and OMA) relating to Hoffman during the time she was Hoffman's supervisor. Nor did Diaz identify any specific statement she made to O'Halloran regarding Hoffman or any directive she gave to O'Halloran (who was also supervised by Diaz) to take any action.

The statements made during open houses, the Student Senate resolution and the BIPOC alumni social media postings occurred in public, and therefore could be sufficient to place an employer on notice, but, as described above, those discrete circumstances are not sufficient to be objectively offensive nor severe or pervasive sufficient to place the employer on notice of an actionable hostile environment.

When Hoffman filed her internal complaint about the behavior she alleged were discriminatory, UWEC took action. (DPFOF ¶ 188.) An investigation occurred, and while that investigation was pending, there was no basis for further action to be taken against Jensen, or the faculty respondents. (DPFOF ¶ 268.) "A prompt investigation is the first step toward a reasonable corrective action." *See Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 898, (7th Cir. 2016). "The question is whether the employer took corrective action "reasonably likely" to prevent harassment from recurring." *Id.* Here, the investigation concluded that no harassment in violation of university policies had occurred. Hoffman and Jensen were no longer working in the same department. Thus, it was reasonable to accept the investigation results and conclude that no further action was warranted in the absence of any additional concerns or complaints raised by Hoffman or presented to the employer. "[T]he emphasis of Title VII in this context is not on redress but on the

prevention of future harm." *Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008); *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 995 (7th Cir. 2011)( recognizing that "in some circumstances, creating physical separation and minimizing time worked together are steps reasonably likely to end harassment.").

Again, Hoffman has no criticism of the acts taken by Diaz. Hoffman credits Diaz for the responses she made during open houses, in staff meetings, in creating distance between Hoffman and her coworkers, and in making herself the conduit for faculty. (DPFOF ¶¶ 79-80.) For example, in her July 28, 2022 complaint, Hoffman praised Diaz as follows: "Diaz has been helpful in trying to help provide a supportive environment. She took on Maggie and Vajfue as a direct supervisor because of their opposition to the merger and has continued to meet regularly with them. She has spoken with [faculty] several times without resolution."  (DPFOF ¶ 181.)

Hoffman may disagree with the result from her complaint and object that Jensen and the faculty members were not subjected to remedial measures. But "Title VII does not mandate corrective action merely upon the filing of a complaint." *Stuyvenberg*, 2010 WL 3766529, at *5 (explaining that a complaining employee cannot demand that her employer discipline other employees or take other corrective action on her say-so alone and "the mere fact that the employer did not discipline them in the way Plaintiff now wants does not suffice to violate Title VII.").

## III.  Defendants are entitled to summary judgment on Hoffman's constructive discharge claim.

Hoffman alleges that she was forced to demote from her position as interim director and MSS assistant director after the following occurred: a June 30, 2022

anonymous complaint was filed against her; a student intern, who was supportive of Hoffman, asked if she was going to be fired because she was white; the August 22, 2022 comment by Kearnen discussed above; and generally, the same conduct described above. (Dkt. 1, ¶¶ 41-47.)

To prevail on a constructive demotion claim, Hoffman must demonstrate that the defendants knowingly allowed conditions of discrimination so intolerable that a reasonable person would have felt compelled to accept a reassignment to a lower-grade position or a demotion. *See Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873 (7th Cir. 1999). In *Simpson*, the plaintiff, who had been working as a supervisor, requested a downgrade to a production worker position. The plaintiff stated that she did not voluntarily ask to be downgraded but sought a reassignment because she had been subjected to sex discrimination. Specifically, the plaintiff stated that certain actions taken by her supervisor undermined her authority and created an intolerable work environment. The *Simpson* Court of Appeals found the constructive demotion analysis to be similar to that used in claims of constructive discharge. Specifically, the employee must show that he or she was subjected to working conditions which were so intolerable that a reasonable person would have been compelled to resign, and that the conditions were intolerable because of unlawful discrimination. *Id.*

Constructive termination or discharge "refers to the situation in which an employer, without firing an employee, makes his working conditions so miserable that it drives him to quit." *Ulichny v. Merton Cmty. School Dist.*, 249 F.3d 686, 702 n.15 (7th Cir. 2001) (quoting *Hunt v. City of Markham*, 219 F.3d 649, 655 (7th Cir.

2000)). The working conditions must be "objectively intolerable" to constitute constructive discharge; the "reasonable person" must feel his working conditions are unbearable. *Id.* at 703; *Chapin v. Fort-Rohr Motors, Inc.,* 621 F.3d 673, 679 (7th Cir. 2010). "The constructive discharge test sets a high bar in order to give an employer an opportunity to address the situation before an employee resigns." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 639–41 (7th Cir. 2009).

In cases where an employee only alleges that she resigned because of discriminatory harassment, she must "demonstrate a discriminatory work environment even more egregious than the high standard for hostile work environment." *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331–32 (7th Cir. 2002) (citation and quotation omitted). A plaintiff making a constructive discharge claim must prove the working conditions were "objectively intolerable" and 'unbearable." *Ulichny,* 249 F.3d at 703. As examples of the very high standard a plaintiff needs to show, constructive discharge was found in one case "when the plaintiffs' boss constantly peppered the plaintiffs with racist comments, brandished a pistol and held it to one plaintiff's head" and in another case when the plaintiff demonstrated "'repeated instances of grossly offensive conduct and commentary' culminated with an incident during which a co-worker showed the plaintiff a racist pornographic photograph, told her that she was hired to perform the task depicted in the photograph, grabbed the plaintiff and threatened to kill her." *Tutman v. WBBM-TV, Inc./CBS, Inc.,* 209 F.3d 1044, 1050 (7th Cir. 2000) (discussing cases).

For the reasons above, no reasonable juror could conclude Hoffman faced such intolerable working conditions that she was forced to demote from any position, particularly given the high standard a plaintiff must meet. Also for the reasons explained above, no reasonable juror could conclude that the positions from which Hoffman claims she was demoted existed or that she held those positions. Hoffman also cannot make out a constructive demotion claim for the interim director position because Hoffman appears to claim that her decision to be "forced to leave" occurred on or about August 23, 2022. (Dkt. 1, ¶ 48.) The timing defeats Hoffman's claim. Lee was selected as MSS director as the result of an open search process on or by August 1, 2022. (DPFOF ¶ 11.) Hoffman chose not to apply for the MSS director position.

## IV.    Hoffman's Retaliation Claims

### A. Acts Hoffman alleges were retaliatory.

Hoffman alleges that defendants retaliated against her for filing a complaint of racial discrimination and hostile work environment based on race on July 28, 2022, and for affirming her wish to continue to pursue the complaint on August 29, 2022. (Dkt. 1, ¶ 52; Huck Decl. ¶ 5, Ex. 1037-008, 010-011.)

Hoffman brings her retaliation claims premised on five allegedly retaliatory acts. First, Hoffman contends that she was told she would teach the MSS Gen 100 course for fall semester 2022 even if she moved out of MSS, but that on September 2, 2022, Lee told Hoffman that she would not teach the MSS Gen 100 course and asked Hoffman to share her syllabus with Jensen. (Dkt. 1, ¶¶ 53-54.) Second, Hoffman also alleges that she was retaliated against because she was also forced to give up the

position of assistant director of MSS and demoted to the position of Student Support Services Coordinator because she complained about the Board's racially motivated employment practices. (Dkt. 1, ¶ 61.) Third, Hoffman contends that "the Board has continued to retaliate against Hoffman by denying her request to work remotely two days a week" in 2023 and by removing all telecommute opportunities in June 2024. (Dkt. 1, ¶ 63; Huck Decl. ¶ 5, Ex. 1037-010-011.) Fourth, Hoffman states that she was retaliated against when her SSS supervisor, Joy Coates, attempted to place Hoffman on a performance improvement plan in or around January 2023. (Huck Decl. ¶ 5, Ex. 1037-010-011.) Fifth, by rating her work as "meets expectations" when she was previously rated as "outstanding" and/or "exceeds expectations" and by excluding her from friendly office conversation. (Dkt. 1, ¶ 63.)

B. **Hoffman did not exhaust administrative remedies and forfeited certain of her Title VII claims against the Board that defendants retaliated against her for filing an internal complaint.**

To bring a lawsuit under Title VII, plaintiffs must exhaust administrative remedies and cannot bring claims in the lawsuit not in the original EEOC charge. *See Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019). A plaintiff is limited to bringing claims "like or reasonably related to the allegations of the charge and growing out of the allegations." *Id.* The exhaustion requirement serves two purposes: (1) giving the EEOC and the employer a chance to settle the matter; and (2) giving the employer notice of the challenged conduct. *Chaidez*, 937 F.3d at 1004. At minimum, the charge and the complaint must "describe the same conduct and implicate the same individuals." *Id. (quoting Cheek v. W. & S. Life Ins. C*o., 31 F.3d

497, 500 (7th Cir. 1994)). "The fact that the charge and complaint generally assert the same kind of discrimination is not sufficient, without some factual relationship between them." *Id.* Because Hoffman was represented by counsel when her ERD complaint was filed, the Court need not read the claims in the ERD complaint liberally in comparing Hoffman's ERD complaint with her federal complaint. *See Chaidez*, 937 F.3d at 1005 n.3 ("[W]here the plaintiff was represented by counsel when the EEOC charge was filed, the argument for liberal construction is weaken[ed].") (internal quotations and citations omitted).

Hoffman filed one ERD complaint on November 18, 2022**.** (DPFOF ¶ 275.) Hoffman identified the date of the most recent discrimination as occurring on September 2, 2022. (DPFOF ¶ 275.) Hoffman refers to retaliation only as follows: "Respondent's threat of career damage [referring to an August 29, 2022 statement by Steinhorst] and reassignment of the Gen 100 course to Maggie Jensen were in retaliation for Hoffman's complaint of racial discrimination filed with the office of Affirmative Action." The Board (the only Title VII defendant) concedes that Hoffman exhausted administrative remedies relating to her claim that the MSS Gen 100 class was taken away from her in retaliation for filing and continuing to pursue the July 28, 2022 complaint.

However, Hoffman did not exhaust any of the other acts of alleged retaliation. The ERD complaint does not exhaust a claim that the transfer to SSS was done in retaliation. Hoffman states only that she was "then transferred to SSS on September 1, 2022" but provides no information sufficient to suggest that it was done in

retaliation for engaging in any protected activities. (DPFOF ¶ 276.) While she names some of the same individuals, she does so only in relation to her claims for disparate treatment and hostile work environment. This is insufficient to place the employer on notice of the claims. If Hoffman contended that the transfer was done for retaliatory reasons, she was required to say so in her ERD charge. As the Seventh Circuit has explained (and reaffirmed):

> An aggrieved [plaintiff] may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination. This limitation ... gives the employer some warning of the conduct about which the [plaintiff] is aggrieved, and it affords the agency and the employer an opportunity to attempt conciliation without resort to the courts.

*Chaidez*, 937 F.3d at 1005-06 (*citing Rush v. McDonald Corp*, 966 F.2d, 1104, 1110).

The ERD complaint does not raise any of the conduct or alleged retaliatory acts that occurred relating to her claims that her SSS supervisor, Coates, excluded her from friendly office conversation beginning sometime after September 2, 2022, rated her work as meets expectations in performance evaluations, contemplated a performance improvement plan in 2023, and modified or refused telecommute requests in 2023 and 2024. There is no reasonable relationship between the allegations in the charge and these claims in the complaint. Nor could they be reasonably expected to grow out of an investigation into the charge. The conduct involves a totally different supervisor, Joy Coates, and Coates had no involvement in any of the conduct alleged in the ERD complaint and they do not pass even the minimum threshold of describing the same conduct and implicating the same individuals. These are not claims of misconduct of which the ERD complaint placed

the Board on notice or provided an opportunity for settlement. *See, e.g., Burton v. HMS Host*, 2024 WL 1254363, * 3 (N.D. Ill. Mar. 25, 2024) (dismissing all federal claims arising out of conduct that occurred after plaintiff filed his EEOC charge).

Hoffman's Title VII claims relating to any allegedly retaliatory acts other than not being assigned as the instructor to teach the MSS Gen 100 course should be dismissed.

### C. No reasonable jury could agree that defendants retaliated against Hoffman.

Hoffman has not demonstrated that she suffered any materially adverse employment actions (a more exacting standard than the one adopted for disparate treatment claims in *Muldrow*) or that there is any causal connection between any alleged protected activity and any alleged adverse actions.

#### 1. Hoffman's Burden

A retaliation claim requires Hoffman to "show that [she] engaged in statutorily protected activity,[10] she suffered a materially adverse employment action, and there was a causal connection between the two." *Xiong v. Bd. of Regents of Univ. of Wisconsin Sys.*, 62 F.4th 350, 354–55 (7th Cir. 2023) (Title VII); *Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 752–53 (7th Cir. 2018) (Section 1981). For both Title VII and Section 1981 retaliation claims,[11] the plaintiff must show that "but for" the

---

[10] For purposes of summary judgment, defendants do not challenge that Hoffman engaged in protected activity on July 28, 2022 when she filed a complaint of racial discrimination and harassment with UWEC's Affirmative Action office.

[11] Hoffman does not bring a § 1983 equal protection claim premised on retaliation. (Dkt. 1.) Nor could she. Any such claim would fail as a matter of law because the Seventh Circuit does not recognize a § 1983 equal protection claim premised on retaliation. *See Boyd v. Illinois State Police*, 384 F.3d 888, 898 (7th Cir. 2004) (holding no claim for retaliation under the equal protection clause).

protected activity the employer would not have taken the materially adverse action. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (Title VII); *Comcast Corp. v. N'tl Ass'n of African American-Owned Media*, 589 U.S. 327, 340 (2020) (Section 1981).

The standards for a retaliation claim under Title VII claim are "broader" than a discrimination claim. *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 648 (7th Cir. 2005); *see Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (explaining that "the challenged adverse action need not be one that affects the terms and conditions of employment, but it must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity"). Federal law protects an employee only from retaliation that produces an injury, and therefore an employer's allegedly retaliatory conduct is only actionable "if it would be materially adverse to a reasonable employee*." Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009). Title VII does not set forth "a general civility code for the American workplace." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The materially adverse standard "must be objective" so as to be "judicially administrable" and to avoid using "a plaintiff's unusual subjective feelings" to determine whether injury has actually occurred. *Burlington Northern*, 548 U.S. at 68-69. An action is materially adverse if it would have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Stephens*, 569 F.3d at 790. Whether an action is materially adverse depends upon the facts and circumstances of each case. *Burlington Northern*, 548 U.S. at 67-69.

To establish a retaliation claim, Hoffman also must demonstrate that because of protected activity, she suffered some retaliatory action that was "materially adverse," meaning something that caused a significant harm. *Burlington Northern*, 548 U.S. at 68. In *Muldrow, supra,* the Court rejected an argument that it "should import the same standard into the anti-discrimination provision at issue" because "*White* adopted the standard for reasons peculiar to the retaliation context." 601 U.S. at 357. Thus, Hoffman's retaliation claim is governed by the more demanding standard of something "materially adverse" that causes "significant harm." *Id.*

**2.  Hoffman's retaliation claim fails because she did not suffer any materially adverse action.**

Hoffman cannot establish she experienced any actionable adverse employment actions as to those other alleged retaliatory acts.

As explained above, Hoffman's move to SSS does not constitute an adverse employment action at all, and certainly, does not rise to the level of a materially adverse action as required for a retaliation claim. The Seventh Circuit has held that a transfer and job title change from assistant vice-president and manager of one bank branch to a loan officer position at a different branch is not necessarily, by itself, a materially adverse employment action. *Crady v. Liberty N'tl Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993); *see also Grayson v. City of Chicago*, 317 F.3d 745, 749–50 (7th Cir.2003) (holding that a difference in job title alone—where the positions are identical in terms of work, pay and benefits—is not materially adverse). Here, Hoffman's official title changed but nothing in the record demonstrates it was a lesser title, her work hours and location of her work did not

change, and her annual salary increased from $42,840 to $52,000 because of the move to SSS. While some of Hoffman's job responsibilities changed, nothing in the record demonstrates that the job responsibilities were worse; Hoffman merely says she left work in BB that she had loved, but employer actions that may make an employee less happy are not necessarily an actionable adverse action. *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action.").

Hoffman's claims relating to her performance evaluations that met or exceeded expectations and the performance concerns raised by Coates are not actionable adverse actions. Hoffman did not receive negative performance evaluations – she was rated as meeting or exceeding expectations in 2023 and 2024 by Coates. (DPFOF ¶¶ 236, 246.) Nor was Hoffman ever placed on a performance improvement plan at all, and even if there was, a performance improvement plan is not a reprimand, discipline or even a step on the path to discipline at UWEC. (DPFOF ¶¶ 233-35.) Even if she had received any negative evaluations or feedback or been placed on a performance improvement plan, they would not meet the materially adverse standard. "[J]ob-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship." *Id.* (quoting *Oest v. Ill Dep't. of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001)). Even undeserved poor employment evaluations, standing alone, are not adverse employment actions. *See Smart,* 89 F.3d at 442. For example, in *Whittaker v. Northern Illinois University,* the plaintiff received negative evaluations and written warnings. The court held the evaluations

and warnings were not adverse employment actions because they did not result in tangible job consequences. 424 F.3d 640, 648 (7th Cir. 2005); *see also Lucas v. Chi. Transit Auth.,* 367 F.3d 714, 731 (7th Cir. 2004) (tangible job consequence must *accompany* reprimand to be an adverse employment action); *Lauth*, 863 F.3d at 717 (negative performance reviews, a written warning and being placed on a PIP were not materially adverse "because Lauth cannot show that they resulted in a 'quantitative or qualitative change in the terms or conditions of employment.'") (cleaned up*); Bagwe v. Sedgwick Claims Mgmt Servs.*, Inc., 811 F.3d 866, 889 (7th Cir. 2016) (PIP did not have materially adverse consequences where it did not impact compensation and the "PIP provides a detailed list of concerns regarding Ms. Bagwe's performance."); *Cole*, 562 at 816-17 (PIP was not materially adverse where it did not impact job benefits, required the plaintiff to submit daily and weekly schedules to her managers to be more aware of her tone and become a better listener). Even a documented reprimand that puts an employee on the first step towards termination, is not an adverse action for a retaliation claim unless there is an associated "tangible job consequence." *Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023).

The refusal to permit Hoffman to telecommute as many days as she wanted in 2023 and to reject her telecommute request in 2024 were not materially adverse employment actions. Telecommuting at UWEC is a privilege, not a right. (DPFOF ¶ 240.) It must be reviewed annually, subject to the needs of the program and in accordance with the determination by the supervisor. *See, e.g., Esters v. Nielsen,* No. 1:18-cv-0254, 2021 WL 722883, * (D.D.C., Feb. 24, 2021) (holding that employer's

denial of a telework request to take care of her mother did not violate Title VII because it was not an adverse employment action and dismissing plaintiff's discrimination and retaliation claims alleging that after she and her supervisor engaged in a series of disputes, including a rejected telework request).

### 3. Regardless, Hoffman cannot show but-for causation.

Hoffman's claims also fail on causation.

As to the sole retaliatory act properly before the court – the MSS Gen 100 course – the record shows that the MSS Gen 100 course was assigned to Jensen to avoid MSS having to pay additional money out of their budget to Hoffman once Hoffman was no longer in SSS. (DPFOF ¶¶ 212, 216-18.) No reasonable juror could conclude that a causal connection exists between Hoffman filing and pursuing her internal complaint and the decision to assign the MSS Gen 100 course to a MSS staff member. Everyone agrees that budget expenditures are a hugely important issue at UWEC. Both Schmidt and Diaz testified that budgetary issues are always a concern for UWEC, and that staff are consistently tasked with keeping budget issues in mind. (DPFOF ¶ 6, 45.) Even accepting as true Hoffman's claim that Lee had told her that Hoffman could continue as the instructor for the MSS Gen 100 course if she transferred to SSS, Lee's subsequent reconsideration of the teaching assignment once Hoffman did announce her transfer to SSS and Lee's realization regarding the associated budgetary outlay, is a legitimate, non-retaliatory reason for not having Hoffman teach the course. (DPFOF ¶ 212.)

Hoffman tries to raise a suspicious timing argument because she was notified that she would not be teaching the course by Lee three days after Hoffman's August 29 conversation with Steinhorst where she confirmed that she wanted to pursue her internal complaint. But Hoffman's argument requires the Court to ignore entirely the fact that Hoffman had announced her intention to transfer to SSS on August 23, 2022. That announcement created the budget issues for Lee to address. The decision was made by Lee, in consultation with Jorgenson. (DPFOF ¶¶ 217-20.) Nowhere does Hoffman suggest that Lee had expressed any discriminatory animus or opposed Hoffman filing an internal complaint.

Nor could any reasonable jury conclude that a causal connection exists between Hoffman's July 28, 2022 complaint and any other of the alleged acts of retaliation. The performance evaluations, the negative performance feedback that never evolved into a performance improvement plan and the telecommuting decisions were all decisions made by Coates. Coates has explained her rationale for her decisions in detail. Coates' concerns about Hoffman's performance were legitimate employer expectations regarding attendance, meeting program requirements, and interacting with students in a manner that Coates directed. (DPFOF ¶ 236-39) Similarly, the decisions relating to telecommuting were made by Coates consistent with program needs. (DPFOF ¶¶ 242-44.) Weakening any causal inference, Coates was not employed at the university until September 1, 2022. (DPFOF ¶ 12.) While Hoffman told Coates she had filed an internal complaint and/or intended to pursue a lawsuit, there is no evidence that Coates made any inquiries or had any personal knowledge

regarding any of the specifics. Further weakening a causal inference, is the passage of time between the July 28, 2022 complaint and the actions Hoffman now calls retaliatory. An inference of retaliation can be weakened by "a lengthy time period between the protected activity and the alleged retaliation." *Alamo v. Bliss*, 864 F.3d 541, 556 (7th Cir. 2017) (internal citation omitted). The performance feedback, performance improvement plan and telecommuting issues were decided months and years after Hoffman filed her July 28, 2022 internal complaint.

**V.     Hoffman's § 1983 claims against O'Halloran and Schmidt must be dismissed for lack of their personal involvement in the alleged discriminatory and retaliatory actions.**

Not only do the claims against Schmidt and O'Halloran fail for the reasons discussed above, they also fail because Hoffman has not shown that either of them was personally involved in causing any alleged violations of Hoffman's constitutional rights, as required to collect damages from an individual under § 1983.

A plaintiff may only bring § 1983 claims against individuals who were personally involved in the constitutional deprivations they purport to have suffered. *See Vinning–El v. Evans,* 657 F.3d 591, 592 (7th Cir. 2011) ("Section 1983 does not authorize 'supervisory liability'".). "Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). Vicarious liability is inapplicable to § 1983 suits and, therefore, to state a claim, "a plaintiff must plead that each Government-official defendant, through the official's own

individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009)("[P]ublic employees are responsible for their own misdeeds but not for anyone else's.").

As shown above, Schmidt and O'Halloran were not personally involved in the constitutional claims alleged by Hoffman. Hoffman concedes she had no interaction with Schmidt at all. (DPFOF ¶¶ 261-63.) Nothing in the record shows that Schmidt or O'Halloran, by their own conduct, discriminated against or directed any harassment at Hoffman. At most, Hoffman alleges that Schmidt did not enter a comment in the section on the Student Senate resolution, but that alone is insufficient to impose personal liability on Schmidt. Not only did Schmidt explain that he never entered a comment on non-binding student resolutions, (DPFOF ¶ 109), his not doing so is, at most, an omission in a supervisory sense that Schmidt is the CEO of UWEC. To the extent the students' expression in their resolution is a "misdeed," Schmidt is not responsible for it. Nor does the evidence support that Schmidt was personally involved in the decision made regarding the MSS Gen 100 course. Simply because Schmidt was made aware of the situation does not satisfy the personal involvement requirement under § 1983. Schmidt cannot be held vicariously liable for the acts of others.

Nor has Hoffman established conduct sufficient to support personal liability for O'Halloran. At most, Hoffman presents facts that O'Halloran was part of the decision to move her to SSS that may implicate O'Halloran in her personal capacity, but Hoffman does not contend that O'Halloran had any involvement regarding her

interim director claims or her claims regarding retaliation for the MSS Gen 100 class. O'Halloran's role in the Affirmative Action Office does not make her vicariously liable for the conduct of others simply because those become known to her, like here, through Hoffman filing an internal complaint.

## VI. Hoffman's claims against O'Halloran and Schmidt are barred by sovereign immunity.

Hoffman sues Schmidt and O'Halloran in their individual capacities for lost wages and benefits and compensatory and punitive damages. Even when a suit is against a state employee in their individual capacity, sovereign immunity may bar the claim if it is truly being brought against the State, as is the case here.

"The general rule is that such [personal] suits are not barred by the [Eleventh] amendment, because the plaintiff is seeking damages from individuals rather than from the state treasurer." *Luder v. Endicott*, 253 F.3d 1020, 1022-23 (7th Cir. 2001). However, the court remains obliged to consider whether Diaz's claim, "may really and substantially be against the state." *Id*. Sovereign immunity bars suits against defendants being sued in their individual capacities where the claims against them are not "bona fide individual capacity suit[s]" and instead seek relief "that would expend itself on the public treasury." *See Omosegbon v. Wells*, 335 F.3d 668, 673 (7th Cir. 2003); *see also Luder*, 253 F.3d at 1022-23.

As described above, Hoffman seeks a variety of damages, including lost wages and benefits, both past and future against the defendants in their individual capacity. Any judgment against them, however, would "expend [itself] on the public treasury" because Hoffman is seeking damages associated with her employment at a state

institution. *See Haynes*, 902 F.3d at 732; *see also Omosegbon v. Wells*, 335 F.3d 668, 673 (7th Cir. 2003) ("[B]ecause [plaintiff] seeks backpay and other forms of monetary compensation based on an employment contract, [the Court thinks] it so inescapable that any resulting judgment will be paid by the state rather than the individual defendants that this bears no resemblance to a bona fide individual capacity suit."). Sovereign immunity will preclude a suit where "'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.'" *Luder v. Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001) (quoting *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101 n. 11 (1984)).

In *Omosegbon*, 335 F.3d at 673, the Seventh Circuit found that the plaintiff's claim "bear[ed] no resemblance to a bona fide individual capacity suit," because plaintiff sought "backpay and other forms of monetary compensation based on an employment contract." The court noted that the defendants "were not even parties to the contract in their individual capacity." *Id*. Because the plaintiff's claim sought damages that would "inescapably" be paid by the state and the individual defendants were not parties to the contract, the court found the claim was one against the university. *See id.*

In *Haynes*, 902 F.3d at 728-729, an African-American professor of six years lost his bid for tenure and sued under Title VII and 42 U.S.C. § 1981(a). The court focused on the "knotty and fact-bound inquiry" of plaintiff's individual capacity claim for damages against the president and provost who acted pursuant to university policy

to approve finally a tenure decision from the vice provost. *Id.* at 728, 732. The professor was under a probationary contract that provided the university would evaluate tenure following his six-year initial term. *Id.* The court found the case "materially the same" as *Omosegbon* because the university administrators were not parties to his employment contract and the plaintiff sought monetary relief for an injury related to his employment with the state university. *Id.* at 732.

A court within the Seventh Circuit recently applied *Haynes*, *Luder* and *Omosegbaon* to dismiss at the pleadings state a termination claim brought by a state employee. *See Wallace*, 2023 WL 4876381 at *3. There, the plaintiff argued that she was not alleging her termination was the breach of any contract. *Id.* But the court rejected her argument, explaining that the "rationale for Eleventh Amendment sovereign immunity applied to her "request for compensatory and punitive damages" against the individual defendant. *Id.* The court concluded that the plaintiff's request for backpay was barred by the Eleventh Amendment because "[p]laintiff seeks to accomplish exactly what she would accomplish were she allowed to maintain this suit against the State and did so successfully: to force the State to pay [p]laintiff her lost wages associated with her employment.")

So too here. Hoffman's claim for lost wages and benefits are really claims against the State. Hoffman brings her claims against O'Halloran and Schmidt under 42 U.S.C. § 1981, alleging that the harm she suffered arose from her employment with the University (*i.e.,* her employment contract) and she seeks monetary relief based on the employment relationship. Thus, her whole claim is predicated on a

contractual claim arising from her relationship with the State as an employer. There is no plausible inference that defendants would be responsible for paying such past wages and benefits; that is the role solely of an employer. *See Haynes*, 902 F.3d at 728-29; *Wallace*, 2023 WL 4876381 at *3; *compare Sizyuk v. Purdue Univ.*, No. 4:20-CV-75-TLS, 2024 WL 68282, at *2, *4 (N.D. Ind. Jan. 5, 2024) (finding sovereign immunity did not apply where the plaintiff brought claims for monetary relief based on alleged constitutional violations); *Doe v. Purdue Univ.*, No. 4:18-CV-89-JEM, 2019 WL 1369348, at *3 (N.D. Ind. Mar. 25, 2019) (finding sovereign immunity did not apply where the "[p]laintiffs are alleging constitutional violations by the individuals, not violations of a contract to which the individuals were not parties."). Hoffman's claims more closely resemble *Luder, Omosegbon and Haynes* and are subject to dismissal based on sovereign immunity.

## VII.    Hoffman's seventh cause of action for punitive damages must be dismissed because punitive damages is a type of remedy, not a cause of action.

Hoffman's Seventh Cause of Action alleges that the actions of defendants Schmidt and O'Halloran "were taken in wanton, willful and/or reckless disregard of the plaintiff's federally protected rights" and that she is therefore entitled to "an award of punitive damages against both defendant Schmidt and defendant O'Halloran." (Dkt. 1, ¶ 82.)

Hoffman's seventh cause of action should be dismissed because the allegations merely set out the prerequisite to recovery of punitive damages, not a separate cause of action. Punitive damages constitute a type of relief, not a separate cause of action. Nor does Hoffman allege any facts that support an independent claim for wanton or

willful conduct or punitive damages. Therefore, the seventh cause of action should be dismissed. If the case proceeds and facts support an award of punitive damages, Hoffman may request such relief be awarded at that time. *See Pelton v. John Crane, Inc.*, No. 1:21-CV-4316, 2024 WL 361425, at *9 (N.D. Ill. Jan. 31, 2024) (recognizing that "punitive damages constitute a type of relief, not a separate cause of action").

## CONCLUSION

For the reasons set forth above, defendants request the entry of summary judgment in their favor.

Dated February 28, 2025.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

s/ Sarah A. Huck
SARAH A. HUCK
Assistant Attorney General
State Bar #1036691

MARY KATHLIN SICKEL
Assistant Attorney General
State Bar #1122612

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7326 (Sickel)
(608) 266-7971 (Huck)
(608) 294-2907 (Fax)
sickelmk@doj.state.wi.us
hucksa@doj.state.wi.us