IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROCHELLE HOFFMAN,

                          Plaintiff,

    v.

BOARD OF REGENTS OF THE UNIVERSITY OF
WISCONSIN SYSTEM, JAMES C. SCHMIDT, and
TERESA O'HALLORAN,

                          Defendants.

OPINION and ORDER

23-cv-853-jdp

---

Plaintiff Rochelle Hoffman asserts that her former employer, the University of Wisconsin—Eau Claire, discriminated against her because she is white and then retaliated against her for filing a complaint about the discrimination. Hoffman previously worked in the Blugold Beginnings office at the university, which provides support to low-income, first-generation, and other underrepresented students. In 2022, Blugold Beginnings merged with the Office of Multicultural Affairs to become the Multicultural Student Services department. After Hoffman was appointed interim director of the new department, students, faculty, and staff objected to her appointment because she was white. Hoffman brings claims under Title VII, 42 U.S.C. § 1981, and the Equal Protection Clause, contending that the university, its chancellor James Schmidt, and its affirmative action director Teresa O'Halloran demoted Hoffman from her leadership position, refused to stop racially discriminatory comments about Hoffman's presence in the department, forced Hoffman to transfer to a different department, and then retaliated in various ways against Hoffman for filing a racial discrimination complaint.

Defendants move for summary judgment. Dkt. 21. The court concludes that sovereign immunity bars the claims against Schmidt and O'Halloran, so the claims against them will be dismissed. As for the Title VII claims, Hoffman has not shown the severe or pervasive harassment necessary to prevail on a hostile work environment claim, nor has she shown that her removal as the instructor of a "GEN 100" class occurred because of her race; the court will grant summary judgment to defendants on those claims. But the remaining claims will proceed to trial. A reasonable jury could find that Hoffman was demoted from interim director and then transferred to a different department because she was white, and it could also find that the transfer occurred in retaliation because Hoffman filed a discrimination complaint.

UNDISPUTED FACTS

The following facts are undisputed except where noted.

## A. Hoffman's employment

Plaintiff Rochelle Hoffman, who is white, worked as a student services coordinator at the University of Wisconsin—Eau Claire beginning in 2019. Defendant James Schmidt is the university chancellor. Defendant Teresa O'Halloran is the affirmative action coordinator. One of O'Halloran's responsibilities was to advise on university policies regarding discrimination and harassment.

Hoffman initially worked in the university's Blugold Beginnings department, which provides support for low-income, first-generation, and other underrepresented students. In 2021, Hoffman was promoted to assistant director of Blugold Beginnings. Hoffman's supervisor was Olga Diaz, the vice chancellor of Equity, Diversity, Inclusion, and Student Affairs. Diaz was part of the university's executive staff, so she reported directly to the

chancellor. She supervised both the Blugold Beginnings department, where Hoffman worked, and the affirmative action office, where O'Halloran worked.

## B. Creation of the Multicultural Student Services (MSS) department

In 2021, the university decided to merge Blugold Beginnings and the Office of Multicultural Affairs. The Office of Multicultural Affairs provided support to racial minority students at the university. The university announced that the merged department would be called the Multicultural Student Services (MSS) department. Some faculty and staff disapproved of the proposed merger, including Maggie Jensen, who is native American, and Rose-Marie Avin, who is black. The Office of Multicultural Affairs had long used an "affinity model" to match staff and students of the same race. Some faculty and staff believed the merger would end the use of the affinity model and cause non-white staff to leave the university. Faculty and staff sent letters to university leadership expressing concerns about the merger and about retention of non-white staff more generally. *See* Dkt. 33-1 (January 26, 2022 letter) and Dkt. 46-4, at 68–70 (February 15, 2022 letter).

## C. Hoffman is appointed interim director of MSS

In late January 2022, Diaz asked Hoffman to serve as interim director of the new MSS department and Hoffman accepted. Hoffman's appointment generated backlash from students. At open houses on February 14 and February 18, students asked Diaz why she "hired a white woman as the interim director" and questioned whether Diaz "personally fe[lt] that white staff can do as effective a job as a person of color, within a space for people of color." Dkt. 35 (Hoffman Dep.) 94:18–97:11. The student senate also released a resolution on February 28 expressing "concerns over placing white-identifying individuals in positions of interim leadership for major [equity, diversity, and inclusion] offices." Dkt. 33-7, at 18.

Some faculty and staff also expressed disapproval with Hoffman's appointment as interim director. In a private meeting with Diaz on February 11, non-white faculty members expressed concerns about the university placing white staff in positions formerly held by non-white staff. (It's disputed whether the faculty knew at this point that Hoffman was to be interim director of MSS.) After the student senate resolution was released, student coordinator Jensen said in a staff meeting that she agreed with the resolution. She also told Hoffman that Hoffman's white identity was "an issue" for Jensen. Dkt. 52, ¶ 56. Hoffman says that staff members also "participat[ed] with the students" at the open houses, but Hoffman did not identify any specific statements made by staff members. *Id.*

Diaz informed Schmidt and O'Halloran about the criticism of Hoffman's appointment as interim director, but they did not take action to stop it. Diaz decided to remove Hoffman as interim director of the MSS department and make her the assistant director instead. In early spring 2022, Hoffman began using the assistant director title on a working basis. She also received overload salary payments for performing duties consistent with the assistant director role, including supervising new MSS staff and chairing a search committee to appoint a new MSS coordinator. In early June, Diaz initiated a "request to fill" application with the HR department to formalize Hoffman's position as assistant director of MSS.

**D. Continued opposition to Hoffman in the MSS department**

Hoffman continued to experience opposition to her role in the MSS department. At open houses throughout the spring and summer, attendees criticized the appointment of white people to leadership positions in the MSS department. In May, Heather Ann Moody, a native American professor, emailed O'Halloran expressing concern that Hoffman and MSS administrative assistant Cheri Snobl, "two white women . . . who have overpowering voices,"

were chairing the search committee for four new positions in the MSS department. Dkt. 37-5. A group called "UWEC BIPOC Alumni"[1] posted criticism about the MSS department's staffing on social media: the group did not mention Hoffman by name, but they said that the department was "overwhelmingly white" and that "positions of decision-making authority [were being] strategically replaced by white folks." Dkt. 33-14. Some faculty and staff "liked" the alumni group's posts on social media. Over 100 faculty members also signed an open letter expressing concerns about the "marginalization" of students served by the equity, diversity, and inclusion department, the resignation of staff who served those students, and the "disregard for collaboration and shared governance" in the department. The letter did not mention Hoffman. Dkt. 46-4, at 78.  Multiple news organizations came to Hoffman's office during the summer to report on the alumni group's posts and on the faculty letter. Schmidt and O'Halloran were aware of the alumni posts, the faculty letter, and the criticism directed at Hoffman during the open houses; they did not speak against it.

Hoffman also asserts that she experienced discrimination within the MSS department in her relationships with faculty and staff. Non-white faculty and staff held three meetings during the spring and summer of 2022 and excluded Hoffman and other people, such as Cheri Snobl, who Hoffman characterizes as "dissenting voices." (The parties dispute whether the attendees discussed Hoffman at these meetings.) Hoffman also says that MSS staff were unfriendly toward her, particularly Maggie Jensen, who refused to communicate with Hoffman after Hoffman was named to MSS leadership. In one meeting, Jensen and student coordinator Charlie Kernan told Hoffman that they wanted to maintain the affinity model. When Hoffman

---

[1] BIPOC stands for "black indigenous people of color"

questioned where she fit into the model, Kernan said that she didn't and "that's why everyone's questioning your legitimacy in this office." Dkt. 36 (Hoffman Dep. 193:22–194:5).

### E. Discrimination complaint and transfer from the MSS department

In late July 2022, Hoffman told human resources manager Jennifer Steinhorst that she wanted to file a racial discrimination complaint about her experiences in the MSS department. In response, Steinhorst suggested transferring Hoffman to another department such as Student Support Services (SSS) or Activities, Involvement, and Leadership (AIL). The day after meeting with Steinhorst, Hoffman filed a discrimination complaint with O'Halloran's affirmative action office.

Instead of immediately sending Hoffman's complaint to the UW system for investigation, O'Halloran emailed Schmidt, Diaz, and several staff members in the HR department, explaining that Diaz was working with HR to transfer Hoffman to another department, which would hopefully settle the complaint. Dkt. 37-18.

Around the same time, Diaz contacted HR to inquire about the status of the request-to-fill application to formalize Hoffman's position as the assistant director of MSS. Steinhorst told Diaz that "conversations regarding [Hoffman's] title and pay are continuing" and that she would be "in touch." Dkt. 46-1, at 78. But Steinhorst testified in her deposition that she did not recall any conversations about Hoffman's position occurring around this time, nor did she remember why HR had not approved the position. Dkt. 46-1 (Steinhorst Dep. 105:5–106:24).

On August 22, Hoffman met with Caitlin Lee, the recently appointed director of the MSS department. Hoffman told Lee that she was experiencing discrimination in the MSS department and Lee suggested that Hoffman transfer to another department. The next day,

Lee contacted Steinhorst and O'Halloran, telling them that Hoffman wanted to transfer from the MSS department to the SSS department. Dkt. 37-22. In an email to Lee on August 24, Hoffman explained: "I do not want to leave this office or my position . . . However, for my mental health and professional safety I don't believe I can stay in this department. This situation isn't an interpersonal conflict, *rather this is a conflict of ideology, that some do not find my presence legitimate in the office.*" Dkt. 37-23 (emphasis in original).

Hoffman transferred to the SSS department on September 2, 2022. Hoffman's title remained the same and her salary in the SSS department was slightly higher, but her job responsibilities were different and she lost the ability to telecommute, which she had been doing at least one day per week while at MSS.

When Hoffman transferred to the SSS department, she also lost her position as the instructor of a GEN 100 class, which she had taught for several years. Hoffman was scheduled to teach the class in the fall semester 2022, but on September 2, Lee told Hoffman that Jensen would be teaching the class instead and asked Hoffman to share her syllabus and other course materials with Jensen.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Hoffman brings claims for hostile work environment, discrimination, and retaliation under Title VII against the university Board of Regents. She asserts these claims under 42 U.S.C. § 1983 and § 1981 against Chancellor James Schmidt and affirmative action coordinator Teresa O'Halloran. Hoffman says that she experienced a hostile work environment because of the criticism from students, faculty, staff, and alumni about appointing white people

to MSS department leadership. And she says that defendants discriminated against her based on her race when they demoted her from the interim director position, transferred her to the SSS department, and removed her as the instructor of the GEN 100 class. Defendants move for summary judgment on the entire complaint.

Defendants are entitled to summary judgment if they show that there are no genuine issues of material fact and they are entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating the motion for summary judgment, the court views the evidence in the light most favorable to Hoffman and draws all reasonable inferences in her favor. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). But in response to defendants' motion, Hoffman bears the burden of identifying evidence that would allow a reasonable jury to find in her favor on her claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## A.  Sovereign immunity

Defendants contend that Hoffman's individual claims against Schmidt and O'Halloran under 42 U.S.C. § 1981 and § 1983 are barred by sovereign immunity. Sovereign immunity bars individual suits against state employees if the suit "demonstrably has the identical effect as a suit against the state," that is, if any money damages "will flow from the state treasury to the plaintiff[ ]." *Luder v. Endicott*, 253 F.3d 1020, 1023–24 (7th Cir. 2001).

The Seventh Circuit has twice held that suits against state officials based on a state employment relationship are barred by sovereign immunity. *Haynes v. Indiana Univ.*, 902 F.3d 724, 731–32 (7th Cir. 2018); *Omosegbon v. Wells*, 335 F.3d 668, 673 (7th Cir. 2003). In *Omosegbon*, the plaintiff sued state university officials under 42 U.S.C. § 1983 for due process and academic freedom violations after the university terminated his junior faculty contract.

335 F.3d at 672. The court held that sovereign immunity barred the plaintiff's claims because he sought "backpay and other forms of monetary compensation based on an employment contract" and therefore the case bore "no resemblance to a *bona fide* individual capacity suit." *Id.* at 673. In *Haynes*, the plaintiff sued several university administrators under 42 U.S.C. § 1981, alleging that he was denied tenure because of his race. Because the plaintiff was seeking "monetary relief for an injury relating to his employment" and because the individual defendants were not parties to his employment contract in their individual capacities, the court determined that there was "no reason to believe that [the individual defendants], rather than the University, would foot the bill for a resulting judgment." 902 F.3d at 732.

Hoffman's claims against Schmidt and O'Halloran, like those in *Omosegbon* and *Haynes*, stem directly from Hoffman's employment contract with the university. Hoffman seeks lost wages, benefits, and other compensation she believes she would have been entitled to if defendants had not interfered with her employment on the basis of her race. *See* Dkt. 1, at 19. Schmidt and O'Halloran were not parties to Hoffman's employment contract in their individual capacities, so the damages she seeks would necessarily be paid by the state. Hoffman's claims against Schmidt and O'Halloran are identical in effect to claims against the state and are therefore barred by sovereign immunity.

In her response brief, Hoffman argues that the damages she seeks from Schmidt and O'Halloran are distinct from her employment contract. She says that she is "not seeking damages for lost wages or lost benefits" against Schmidt and O'Halloran; instead, she is seeking compensatory and punitive damages for Schmidt and O'Halloran's violations of her constitutional rights. Dkt. 47, at 37–38. District courts in this circuit are split as to whether seeking compensatory and punitive damages other than lost wages and benefits distinguishes

an individual-capacity claim under § 1981 or § 1983 from a claim against the state. *Compare Sizyuk v. Purdue U.*, No. 4:20-cv-75-TLS, 2024 WL 68282 (N.D. Ind. Jan. 5, 2024) (Sovereign immunity did not apply because "[p]laintiff has alleged constitutional violations against [the individual defendant]. She is not bringing a claim against him based in contract or on the employment relationship, and she is not seeking wage-like damages from him.") *with Smith v. Illinois Dept. of Corrections*, No. 24-cv-5022, 2025 WL 744098 (N.D. Ill. Mar. 7, 2025) (even though plaintiff pleaded damages beyond lost wages and benefits, sovereign immunity applied because the "complaint centers around alleged constitutional violations premised on her employment relationship with the state") and *Wallace v. Owens*, No. 22-cv-3129, 2023 WL 4876381 (C.D. Ill. July 31, 2023) (same).

The court is not persuaded that this case is meaningfully different from *Omosegbon* and *Haynes* simply because Hoffman seeks damages other than lost wages and benefits. *Omosegbon* and *Haynes* turned on whether the claims against the individual defendants stemmed from the plaintiff's state employment contract, not on whether the plaintiffs sought damages other than lost wages and benefits. *See Omosegbon*, 335 F.3d at 668 (plaintiff seeks compensation "based on an employment contract"); *Haynes*, 902 F.3d at 732 (plaintiff seeks "monetary relief for an injury relating to his employment"). In fact, the plaintiff in *Haynes* did seek damages other than lost wages and benefits. *See Haynes v. Indiana U.*, No. 15-cv-1717 (S.D. Ind.), Dkt. 1, at 20 (complaint requesting damages for "emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation"); *see also Smith*, 2025 WL 744098, at *4 (noting this fact). The court of appeals did not discuss these damages in its opinion, but the fact that Haynes sought these types of damages did not prevent the court from holding that his individual-capacity claims were barred by sovereign immunity. Hoffman's claims against

10

Schmidt and O'Halloran are identical to *Omosegbon* and *Haynes* in all material respects, because she asserts that Schmidt and O'Halloran denied Hoffman employment opportunities she would have received *from the state* in the absence of race discrimination. Hoffman's claims against Schmidt and O'Halloran are barred by sovereign immunity. The claims against them will be dismissed.

The court now turns to Hoffman's hostile work environment, discrimination, and retaliation claims against the university under Title VII.

**B.  Hostile work environment**

Hoffman asserts that she experienced a hostile work environment due to the "onslaught of racial abuse and hostility" from faculty, staff, students, and alumni who were opposed to Hoffman's appointment to MSS department leadership. A Title VII hostile work environment claim has four elements: (1) plaintiff was subject to unwelcome harassment; (2) the harassment was based on her race; (3) "the harassment was so severe or pervasive as to alter the conditions of her employment;" and (4) there is a basis for employer liability. *Equal Emp. Opportunity Comm'n v. Vill. at Hamilton Pointe LLC*, 102 F.4th 387, 401 (7th Cir. 2024). The third element is dispositive in this case. No reasonable jury could find that the harassment Hoffman identifies was so severe or pervasive that it altered the conditions of her employment.

The "severe or pervasive" element of a hostile work environment claim is both subjective and objective: the employee must show both that she herself perceived the environment as hostile and abusive and that a reasonable person would perceive it that way. *Id.* Whether an environment is objectively hostile is a question of fact that requires consideration of the whole context. *Id.* "Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive."

11

*Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1118 (7th Cir. 2022) (quotations and citations omitted). Rather, the circumstances should be considered as a whole, considering factors such as the frequency and severity of the discriminatory conduct, who the perpetrators were, whether the conduct was physically threatening or humiliating as opposed to mere verbal abuse, and whether the conduct was directed at the plaintiff as opposed to experienced secondhand. *Hamilton Pointe*, 102 F.4th at 402–03; *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 545 (7th Cir. 2011); *Hall v. City of Chicago*, 713 F.3d 325, 330–32 (7th Cir. 2013). The phrase "severe or pervasive" is disjunctive; a single severe episode of harassment can create a hostile work environment, but so can a relentless pattern of lesser harassment. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002).

Hoffman asserts that she was subjected to a pattern of hostile conduct between February and August 2022 based on the following events:

- Non-white faculty members sent letters to university leadership criticizing the university's decision to merge the Blugold Beginnings department and the Office of Multicultural Affairs. The faculty expressed concerns that non-white faculty and staff who left the university were being replaced by white staff to the detriment of non-white students. Dkt. 37-2 (January 26 letter); Dkt. 33-3 (February 15 letter); Dkt. 46-4, at 78 (June 14 letter).

- Staff who formerly worked for the Office of Multicultural Affairs did not want to report to Hoffman after she was appointed interim director of the MSS department. Coordinator Maggie Jensen told Hoffman that Hoffman's "identity as a white woman was an issue" for Jensen and coordinator Vaj Fue Lee told Diaz that Hoffman didn't have the "cultural competence to be in this role." Dkt. 35 (Hoffman Dep. 89:5–13); Dkt. 31 (Diaz Dep. 69:18–23).

- At open houses in February–May 2022, attendees criticized Hoffman's appointment to MSS leadership. Attendees asked Diaz: "you hired a white woman as the interim director?" and "do you personally feel that white staff can do as effective a job as a person of color, within a space for people of color?" Dkt. 35 (Hoffman Dep.) 94:18–97:11.

- During an internal meeting in February, members of the student senate criticized Hoffman's appointment as interim MSS director because Hoffman

was white. Dkt. 43 (declaration of student senate member Molly Urmanski). One student said that Hoffman's "white race as an EDI director was an issue." *Id.* ¶ 9. The student senate subsequently released a resolution advocating for maintaining the affinity coordinator model in the MSS department. Dkt 35-18. The resolution also expressed "concerns over placing white-identifying individuals in positions of interim leadership for major EDI offices." *Id.* at 3.

- In May 2022, professor Heather Ann Moody emailed O'Halloran to complain that Hoffman and MSS administrative assistant Cheri Snobl, "two white women . . . who have overpowering voices," were chairing the search committee for four new positions in the MSS department. Dkt. 37-5.

- From May–July 2022, a group called "BIPOC UWEC alumni" posted comments on social media about white employees, including: "the new structure of EDI is overwhelmingly white;" "whiteness is being reproduced in spaces where it is supposed to be questioned;" and "as BIPOC staff leave the university . . . these positions of decision-making authority are being replaced by white folks." Dkt. 33-14. Some MSS-affiliated faculty and staff "liked" these social media posts. *Id.*

- Newspapers ran stories about Hoffman's appointment to MSS leadership, including a February 22 story in the university's student newspaper that included comments about whether white people should be employed in diversity-focused positions. Dkt. 33-5. News organizations also came to the MSS office in June 2022 to report on the alumni group's social media posts. Dkt. 27-3, at 6. The university's public relations director selected a black MSS employee to speak to the media instead of selecting Hoffman.

- In June 2022, professor Rose Marie Avin exchanged emails with Tamara Johnson, a former vice chancellor of the university, in which she complained that "a white woman named Rochelle supervises the new multicultural center." Dkt. 46-5, at 60.

- MSS staff held three meetings during the spring and summer of 2022, deliberating excluding Hoffman and other white people from these meetings. Dkt.45-6, at 73–77 (May 18 meeting); Dkt. 46-4, at 95–97 (July 6 meeting); Dkt. 37-9 (July 25 meeting).

- At a staff meeting on August 17, MSS coordinators Maggie Jensen and Charlie Kernan said they wanted to continue matching staff and students based on shared racial identity. When Hoffman asked where she fit in, Kernan told her, "You don't fit into this model, and that's why everyone's questioning your legitimacy in this office." Dkt. 35 (Hoffman Dep. 194:1–5).

- An anonymous student filed a discrimination complaint against Hoffman with the university Affirmative Action office. The claim said, "[a]s a student of color,

Rochelle's presence in [the Office of Multicultural Affairs] makes me uncomfortable." Dkt. 37-12, at 6.

As an initial matter, Hoffman's work environment was not affected by conduct that she did not know about. *Mason v. S. Illinois Univ. at Carbondale*, 233 F.3d 1036, 1046 (7th Cir. 2000). Hoffman didn't learn about the emails from Rose-Marie Avin to Tamara Johnson complaining about "a white woman named Rochelle" and from Heather Ann Moody to O'Halloran complaining about "two white women . . . who have overpowering voices" until discovery in this lawsuit, so those emails are irrelevant to her hostile work environment claim.

The conduct Hoffman did know about falls into three categories. The first category consists of general statements from students, staff, faculty, and alumni about diversity on campus and the role of white people in diversity-focused departments. This category includes the January, February, and June 2022 faculty letters, the newspaper articles about the MSS department, the BIPOC UWEC alumni social media posts, the February 2022 student senate resolution, and many of the comments made at open houses. In any hostile work environment case, determining whether the plaintiff experienced objectively severe or pervasive harassment "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). In this case, the university was in the midst of a broader discussion about racial diversity and how to support non-white students. That discussion in 2022 focused on the MSS department because of the recent merger of Blugold Beginnings and the Office of Multicultural Affairs and because the MSS department's mission included providing support to non-white students. Viewed in context, no reasonable jury could find the statements about white people in the MSS department objectively hostile or abusive, because they were part of a broader academic discussion about campus diversity. Reasonable people could hold differing opinions about the

role of white people in leadership positions in university offices devoted to the interests of minority students.

The second category consists of statements directly questioning Hoffman's role in the MSS department, including when a student asked Diaz at an open house, "you hired a white woman as interim director?," when Jensen told Hoffman that Hoffman's race was "an issue," when Kernan told Hoffman that everyone was "questioning her legitimacy in this office," and when a student filed an anonymous complaint that "as a student of color," Hoffman's presence in the office made her uncomfortable. Even though these statements targeted Hoffman directly, their general tenor is the same as the statements in the first category: the speakers were expressing an opinion on an issue reasonable people could disagree on, specifically whether non-white students can be served equally effectively by white and non-white staff. The tone of these statements was mild and none of the speakers used racial epithets or expressed offensive, demeaning, or dehumanizing views about white people more generally. No reasonable jury could find these statements objectively hostile or abusive either.

The third category consists of unfriendly behavior from Hoffman's coworkers. Specifically, Hoffman says her coworkers excluded her from three meetings in May and July 2022 and that one coworker, Maggie Jensen, refused to speak with Hoffman after she was appointed interim director of MSS. But isolated incidents of rude conduct from coworkers is generally insufficient to support a hostile work environment claim. See *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (no hostile work environment where supervisor "treated [plaintiff] in a rude, abrupt, and arrogant manner, ignored her work-related suggestions and failed to keep her informed about changes at work"). Exclusion from meetings or other work activities can create a hostile work environment if the exclusion is

all-encompassing. *See Hall*, 713 F.3d at 330–32 (7th Cir. 2013) (supervisor relegated plaintiff to menial work, excluded her from all meetings, and told other employees not to speak or associate with her). But Hoffman's evidence of exclusion falls far short of that in *Hall*. Even viewed in the most favorable light, Hoffman has shown nothing more than "relatively isolated instances of non-severe misconduct," which were not severe or pervasive enough to alter the terms of her employment. *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 646 (7th Cir. 2005).

## C. Discrimination

To prevail on her Title VII race discrimination claims, Hoffman must show that the university took an adverse employment action against her because of her race. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Hoffman has identified three adverse actions: (1) demoting her from interim MSS director to assistant director; (2) transferring her from the MSS department to the SSS department; and (3) removing her as the instructor for the GEN 100 class.

### 1. Demotion from interim MSS director to assistant director

Hoffman asserts that in January 2022, Diaz asked Hoffman to be interim director of the new MSS department and Hoffman accepted. But in early March, Diaz demoted her to assistant director because of the backlash from faculty, staff, and students who did not want a white person leading the department. Dkt. 47, at 21. The university challenges both the adverse action and causation elements for this claim.

The university contends that the demotion was not an adverse action because an interim director position for the MSS department never formally existed. In essence, defendants argue that Hoffman couldn't be demoted from a position she didn't officially have. But Hoffman doesn't need to show an official appointment to meet the adverse action

16

requirement; she only needs to show "harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 355 (2024). Hoffman lost job responsibilities when Diaz demoted her from the interim director role, namely supervisory responsibilities over student coordinators Maggie Jensen, Vaj Fue Lee, and Jacqueline Navarez. A reasonable jury could find that losing these responsibilities was an identifiable harm to her employment.

As for the causation element, the university contends that Diaz demoted Hoffman not because of discriminatory animus but to "shield [Hoffman] from the negative reactions of others." Dkt. 35 (Hoffman Dep. 127:5). The university argues that Hoffman cannot show that the demotion occurred because of her race if the decisionmaker, Diaz, didn't hold racial animus. But this argument mischaracterizes the standard for a racial discrimination claim. Plaintiffs in discrimination cases frequently rely on evidence of a decisionmaker's racial animus to prove that an adverse action was caused by the plaintiff's race, but animus is not an element of a discrimination claim. Plaintiff must show only that the decisionmaker took an adverse action "because of" plaintiff's race. *Ortiz*, 834 F.3d at 765. A well-intended but patronizing effort to shield an employee from racial hostility is enough to show causation.

*Schandelmeier-Bartels v. Chicago Park District*, which the university cites in its brief, confirms that a showing of animus is not required to prove discrimination. 634 F.3d 372, 380–81 (7th Cir. 2011). The plaintiff in *Schandelmeier-Bartels* relied on a "cat's paw" theory of liability, in which a biased subordinate influences an unbiased decision-maker. In reviewing the instructions that the district court gave the jury, the court of appeals explained that under any theory of liability, the key question is simply whether the employer would have taken the same action if plaintiff's race were different but everything else was the same. *Id.* at 381. Hoffman

has adduced evidence that Diaz demoted her from the interim director position because "people . . . had questioned whether a white person" should be leading the MSS department. Dkt. 37 (O'Halloran Dep. 67:9–25). That's enough for a reasonable jury to find that Diaz would have made a different decision had Hoffman not been white.

### 2.  Transfer from MSS department to SSS department

In late August 2022, Hoffman moved from the MSS department to a new position in the SSS department. As with the demotion from interim director, the university contends that the transfer wasn't an adverse action because Hoffman suffered no formal reduction in her title or salary. But this argument fails for the same reason discussed above. Hoffman had responsibilities, such as supervising MSS coordinators and chairing a search committee, that were consistent with holding the assistant director position. When she transferred to the SSS department, she was reverted back to a non-supervisory student services coordinator position. So even though Hoffman didn't suffer losses in title or salary, a reasonable jury could find that the loss of her leadership responsibilities was "harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 355.

The university also contends that Hoffman's transfer wasn't an adverse action because it was voluntary. But there are genuine disputes as to the voluntariness of the transfer. Hoffman said in her deposition that when she spoke to Jen Steinhorst in the HR department in late July, Steinhorst told Hoffman to pick a department she wanted to transfer to, in effect telling her that she had to leave MSS. Dkt. 35 (Hoffman Dep. 174:13–175:7). When Hoffman met with newly appointed MSS director Caitlin Lee on August 22, Lee also told Hoffman she should transfer. Dkt. 45 (Hoffman declaration), ¶ 64. Lee told Steinhorst and O'Halloran in an email the next day that "Rochelle has come to me and wants to leave MSS for SSS." Dkt. 37-22. But

Hoffman's version of events is that Lee offered no solutions other than a transfer, and that Hoffman only agreed because she understood from her conversation with Steinhorst that the university was requiring her to transfer. *See* Dkt. 37 (Hoffman Dep. 178:10–12) ("there's not a ton of wiggle room as far as what your options are when HR tells you you have to do something."). In an email on August 24, Hoffman told Lee: "Like I said, I do not want to leave this office or my position. This work has been my home. I have been doing this for the past 6 years, and it has been an absolute joy. However, for my mental health and professional safety I don't believe I can stay in this department." Dkt. 37-23. A reasonable jury could infer from Hoffman's statement, "like I said," that Hoffman told Lee on August 22 that she did not want to transfer, but that Lee forced her to do so anyway.

In her response brief, Hoffman characterizes her move to SSS as a "constructive transfer." Like constructive discharges, a constructive transfer claim typically requires a showing of conditions even more intolerable than a hostile work environment claim, so the failure of Hoffman's hostile work environment claim would typically doom her constructive transfer claim as well. *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876–77 (7th Cir. 1999). But here, the essence of Hoffman's claim is that the university gave her no choice but to transfer, not that she transferred to get away from intolerable working conditions. The real issue here is voluntariness; because that's genuinely disputed, summary judgment is not appropriate.

### 3. Removal as GEN 100 instructor

Hoffman next contends that she was discriminated against when Lee removed her as the instructor of a GEN 100 class for the fall semester 2022. But no reasonable jury could find that Lee removed Hoffman as the GEN 100 instructor because of her race. Defendants have

explained that teaching GEN 100 was part of Hoffman's regular duties when she was in the MSS department; after Hoffman moved to the SSS department, the MSS department would have needed to pay her extra to teach the course. Essentially, defendants say that the loss of the GEN 100 class was a natural consequence of Hoffman's transfer to the SSS department, not an independent adverse action.

Hoffman argues that a reasonable jury could find that her removal as the GEN 100 instructor was discriminatory for three reasons. First, she says that the person who replaced her, Jensen, was not as qualified to teach the course as Hoffman was. But Jensen's qualifications are irrelevant to defendants' stated reason for removing Hoffman. Defendants say that Lee removed Hoffman as GEN 100 instructor because the department would have needed to pay Hoffman extra to teach the course after she moved to the SSS department. It is undisputed that the department did not need to pay Jensen extra to teach the course, so no reasonable jury could find that that defendant's stated reason was pretext for discrimination based on the decision to replace Hoffman with Jensen.

Second, Hoffman says that Lee "never mentioned financial considerations at the time and only now raises that as a basis for her decision." Dkt. 47, at 32. When an employer only provides a reason for its decision after the fact, a reasonable jury can infer that it is a post-hoc rationalization for a discriminatory decision. *Bragg v. Munster Med. Research Found. Inc.*, 58 F.4th 265, 272 (7th Cir. 2023). But here, it is undisputed that Lee *did* consider finances at the time. Lee did not provide that reason to Hoffman when she informed Hoffman about the decision. But contemporaneous emails show that Lee and other MSS department leaders discussed how much it would cost to have Hoffman continue as the instructor before Lee decided to remove her. Dkt. 37-25, at 9–10. No jury could find that the financial considerations were a post-hoc

rationalization in light of undisputed evidence that Lee considered that issue before making the decision.

Third, Hoffman says that Lee lied by telling Hoffman that Diaz supported her removal as GEN 100 instructor when the "evidence clearly shows" that Diaz wanted Hoffman to teach the course. But Hoffman doesn't explain why Diaz's opinion matters. Lee was the new MSS leader at this point, so it was Lee's decision whether or not to allow Hoffman to teach the GEN 100 course. *See* Dkt. 38-26, at 10 (August 26 email from Diaz to MSS leadership saying that Hoffman would teach the course "if [Lee] wants her to"). Lee's motive is what matters here, and Hoffman has no evidence from which a reasonable jury could find that Lee removed her for any reason other than because Hoffman transferred to another department. The court will grant summary judgment to defendants on Hoffman's discrimination claim based on her removal as the GEN 100 instructor.

## D. Retaliation

Hoffman also contends that the university transferred her to the SSS department and removed her as the GEN 100 instructor in retaliation for filing a discrimination complaint. A Title VII retaliation claim has three elements: (1) plaintiff engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 387 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). The court has already concluded that the university removed Hoffman as GEN 100 instructor not because of her race or protected activity, but because teaching that course was no longer part of her regular duties once she transferred to the SSS department. So that leaves her retaliation claim based on her transfer to the SSS department.

The university's only challenge to the merits of the retaliatory transfer claim is that the transfer was not an adverse action. The adverse action requirement for a retaliation claim is somewhat stricter than for a discrimination claim: Hoffman must show that the adverse action was sufficiently "material" to dissuade an ordinary employee from making a discrimination complaint. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Muldrow*, 601 U.S. at 348 (materiality requirement for retaliation claims does not apply to discrimination claims). But the higher standard does not change the court's analysis. Hoffman has adduced evidence that her transfer to the SSS department resulted in the loss of a leadership position and supervisory responsibilities. A reasonable jury could find that losing leadership responsibilities would deter an ordinary employee from complaining about discrimination. *See White*, 548 U.S. at 71 (jury could find that reassignment from forklift driver to laborer was a materially adverse action because forklift driver was "objectively considered a better job").

The university also contends that Hoffman failed to exhaust her administrative remedies for her retaliatory transfer claim. Before bringing a Title VII claim, a plaintiff must exhaust her administrative remedies by filing a charge with the EEOC. *Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019). In federal court, a plaintiff may raise only those claims that were included in her administrative charge or that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Id.* (internal quotations omitted). At minimum, the federal complaint must describe the same conduct and implicate the same individuals as the administrative charge. *Id.*

Hoffman said in her EEOC charge that she had experienced both discrimination and retaliation, but she did not specifically say her transfer to the SSS department was retaliatory. The relevant portion of the EEOC charge reads as follows:

> Hoffman . . . filed a clam with the office of Affirmative Action on July 28, 2022 alleging racial discrimination and a hostile work environment based on race.
>
> . . .
>
> On August 29, 2022 Jen Steinhorst in Human Resources requested a meeting with Hoffman and suggested that she drop the Affirmative Action filing and that there might be career damage if she did not.
>
> Hoffman then transferred to SSS on September 1, 2022. In being forced to transfer Hoffman lost not only her Assistant Director position in MSS, she also lost a course she had been teaching for several years, "Gen 100", which was taken away from her and given to Maggie Jensen.
>
> Respondent's threat of career damage and reassignment of the "Gen 100" course to Maggie Jensen were in retaliation for Hoffman's complaint of racial discrimination filed with the office of Affirmative Action.

Dkt. 27-1, at 8. Hoffman's retaliatory transfer claim is reasonably related to the allegations in her EEOC charge. She doesn't specifically say in the charge that the transfer was retaliatory, but she describes all the relevant conduct related to her retaliatory transfer claim. She says that she filed her discrimination claim in late July 2022. Approximately a month later Jen Steinhorst suggested she drop the discrimination complaint and shortly thereafter, she was transferred to the SSS department. These allegations are sufficient to put the university on notice of the retaliatory transfer claim.

CONCLUSION

Defendants' motion for summary judgment will be granted only in part. The claims against defendants Schmidt and O'Halloran are dismissed as barred by sovereign immunity. The court is granting summary judgment on Hoffman's hostile work environment claim under

Title VII and on her discrimination and retaliation claims based on her removal as the GEN 100 instructor. This case will proceed to trial against the Board of Regents on Hoffman's claims for race discrimination based on her demotion from interim director to assistant director of the MSS department and for race discrimination and retaliation based on her transfer from the MSS department to the SSS department.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 21, is GRANTED in part and DENIED in part as described in this opinion.

2. Defendants James Schmidt and Teresa O'Halloran are DISMISSED from this case with prejudice.

Entered May 27, 2025.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge